WALSH and others, Plaintiffs in error, vs. FISHER, Defendant in error.

*December 17, 1898 — February 21, 1899.*

*Master and servant: Entire contract: Quitting work: Threats of violence by strikers: Recovery of wages: Liquidated damages: Instructions to jury.*

1. No recovery can be had for services under an entire contract where the employee voluntarily abandons the work, without valid excuse, before the end of the stipulated time.

2. In an action to recover for the services of an employee who had quit work in breach of his contract, the evidence would have justified a finding either that he quit pursuant to an agreement with others to strike or that he quit because of a justifiable fear of bodily violence from the strikers. The court was asked to instruct that if he left for the former reason there could be no recovery. *Held*, that it was error to modify such instruction by adding the words: "That is, if that was the reason he quit, and the danger or apparent danger was not such that a man of ordinary nerve would have refused to go on with the work, your verdict will be for defendants."

3. One employed for a stipulated time, if excused in leaving sooner by reason of threats of strikers to do him bodily harm, can recover only the value of his services after deducting the damages, if any, suffered by the employer by reason of the breach of the entire contract.

4. Contractors for the loading and unloading of vessels and cars upon docks, who had given bond for prompt performance, stipulated in a written agreement with their employees that for a breach of such agreement by the latter in quitting the service the employer might

retain, as liquidated damages, any wages then earned by the employee quitting, not exceeding fifteen days' wages in all. *Held*, that such stipulation was justified, and that the amount so to be retained should be regarded as liquidated damages and not a penalty.

ERROR to review a judgment of the superior court of Douglas county: CHARLES SMITH, Judge. *Reversed.*

This was an action to recover $25.50, for fifteen days' personal services rendered by one McKillop to the plaintiffs in error in June and July, 1896, the claim having been assigned by McKillop to *Mrs. Fisher*, the defendant in error. The answer, after a general denial, contained a counterclaim, alleging that McKillop was employed under an entire contract for the season of 1896, and that he breached said contract without cause, and claimed damages for such breach. On the trial it appeared that the plaintiffs in error, as copartners, had entered into a contract with various railroad and steamboat companies for the loading and unloading of vessels and cars upon some of the docks at West Superior for the season of 1896, and had given bond for the prompt performance of such contract in a considerable sum. In order to perform this work, two classes of men were employed. One class, to which McKillop, *Mrs. Fisher's* assignor, belonged, were known as day men, who were regularly employed under a contract which stipulated that they should work throughout the season of 1896, and should receive pay at a stipulated rate per day for every working day, whether work was provided for them or not. Of this class there were about eighty men. The other class, known as hourly men, were employed casually, as the occasion arose, and paid by the hour for the time they in fact worked. Of these, the defendants had employed at times some 300. McKillop, in common with the other day men, had entered into a written agreement of employment, which, in addition to the terms above mentioned, provided several ways in

which it might be terminated; among others, the following: First, by first party or his agents discharging second party for any violation of this agreement in any respect; third, by the neglect, refusal, or inability of the second party at any time to obey the orders of the first party or his foreman, or to perform a fair and reasonable day's work; fourth, by the failure of the second party to perform any agreement therein. It further provided that, in case of termination for either of the above-mentioned causes, the first party might retain any wages then earned by the second party, not exceeding fifteen days' wages in all, to his own use, as and for liquidated damages for the breach thereof, which said sum was agreed to be the ascertained damages for such termination and breach, and a fair and full compensation therefor. It was also provided that payment should be made on the fifteenth of each month for the work done during the preceding month.

McKillop knew or had heard when he signed the contract that the plaintiffs in error had contracted with railroad and steamship companies as aforesaid, and were under bonds; that a large force was required to carry out their contracts; that boats and cars were liable to come in at all times of the day or night, and would have to be loaded or unloaded; and that it required a few experienced men to work with the inexperienced ones to safely and speedily conduct the work.

It appears by the evidence that on the evening of the 6th of July, 1896, the so-called hourly men quit in a body, or "struck," demanding an increase of wages; and that the 'Longshoresmen Union, on the following day, July 7th, discussed the question of that strike, and assumed control and jurisdiction of it for the hourly men, and served on the plaintiffs in error a notice signed by their officers, demanding an increase of pay for the hourly men. It appears that McKillop had for something like a year been a member of

the 'Longshoresmen Union, but had dropped out of active connection with it, and did not know that the union was having anything to do with the strike of the hourly men. The day men, continuing to work during the 7th and 8th of July, were interfered with by squads of the striking hourly men, and threatened with serious violence unless they also quit work. This interference did not occur at the docks where they were at work, but upon the streets, as they were going to and from their work. These threats were of personal injury, and, as McKillop and others of the day men testified, put them in serious fear; so that on the evening of July 8th a considerable number of the day men, including McKillop, attended a meeting of the 'Longshoresmen Union, at which it was demanded that the day men also quit work, unless wages were raised both for the hourly and day men, and that such quitting take place at noon of the following day, unless the demands were acceded to; and a resolution was offered and passed that the day men must quit accordingly, unless such concessions were made. It does not appear that McKillop voted on this resolution, nor whether he entered into any agreement other than that which may be inferred from the fact that he was a member of the union, and hence impliedly bound to abide its decisions. McKillop testifies that he was again interfered with on the morning of the 9th on his way to work, by seven or eight of the strikers; and at noon he quit work, as did also all of the day men who belonged to the union, the plaintiffs in error having declined to accede to their demands.

McKillop testifies: "I was stopped on my way to work the morning of the day I quit. There were seven or eight of them. They asked me if I was going to quit. I said I didn't think I would. They said, if I didn't quit, they would club me to death; they would murder half of us down there. I said nothing more, but kept on going. I worked until noon that day. On our way home we were met by another

gang, and they told us to stay home that afternoon. I don't
know who those men were. I didn't go back to work that
afternoon. I was kind of scared of those men down there
in the yard. I boarded at the corner of Third street and
Banks avenue. I didn't consider it safe at any time after I
quit, until the strike was over, for me to go back to work,
and for that reason I remained away. I heard of men get-
ting held up and attacked after I quit. I don't know what
men they were. They were working for *Mr. Walsh.* I quit
because I feared those men I met in going to and from my
work would hurt me."

On cross-examination he testified as follows: "It is a
fact that the reason I quit was because the rest of the day
men quit;" and, further: "I didn't know for sure at noon
of July 9th that I was going to quit. I thought everything
might be all right when we got home at noon; that is, the
strike might be called off, or something. I was thinking
that."

After the day men quit, on the 9th of July, the strike
continued for some days, the officers of the union exerting
themselves to prevent men coming in from St. Paul and
Minneapolis to supply the place of the strikers; and the
plaintiffs in error were undoubtedly put to great straits and
large expense by reason thereof, though they were not al-
lowed on the trial to go into that, it being held that their
damages were liquidated by the written contract.

The defendant in error claimed that there was due Mc-
Killop, when he quit, fifteen days' wages, which, at the con-
tract price of $1.70, amounted to $25.50, and put in evidence
a written assignment to her of all claim against the plaintiffs
in error for work, labor, and services done and performed
during June, 1896, amounting to $25.50, dated July 24,
1896.

The jury found for the defendant in error, and to reverse
the judgment entered thereon, after first moving to set the

verdict aside, as contrary to the evidence, the defendants below brought their writ of error.

*A. T. Rock*, for the plaintiffs in error.

For the defendant in error there was a brief by *O'Brien & Vaughn*, and oral argument by *P. H. O'Brien.* They argued, *inter alia*, that the plaintiff's assignor having been prevented from fully performing his contract without the fault of either party, could recover for the work done under it upon an implied *assumpsit.* 1 Beach, Modern Law of Contracts, § 228; *Parker v. Macomber*, 17 R. I. 674; *Cutter v. Powell*, 6 Term, 320; *Bream v. Marsh*, 4 Leigh, 21; *Haynes v. Second Baptist Church*, 12 Mo. App. 536; *Carpenter v. Gay*, 12 R. I. 306; *Farrow v. Wilson*, L. R. 4 C. P. 744. A strike of workmen is no excuse for the failure to perform a contract, but where the workmen abandon their work, and by violence and intimidation prevent other employees who are ready and willing to work from doing so, then this ceases to be a strike. *Geismer v. L. S. & M. S. R. Co.* 102 N. Y. 563; 1 Beach, Mod. Law of Cont. § 238; *Pittsburgh, Ft. W. & C. R. Co. v. Hazen*, 84 Ill. 36; *Pittsburgh, C. & St. L. R. Co. v. Hollowell*, 65 Ind. 188; *Lake Shore & M. S. R. Co. v. Bennett*, 6 Am. & Eng. R. Cas. 391; *Indianapolis & St. L. R. Co. v. Juntgen*, 10 Ill. App. 295.

Winslow, J. The question which was sharply litigated in this case was whether McKillop quit because of genuine and justifiable fear of serious bodily violence at the hands of the hourly men who had struck, or because of the agreement or resolution of the day men to strike at noon of the 9th of July, unless the demands of the hourly men were acceded to. There was evidence which would justify a finding either way on these propositions. Certainly, there were ample facts which would justify the conclusion that McKillop quit because he choose to abide by the resolution, or, in other words, that he was in fact one of the second set of strikers. If such

were the case, no recovery could be had, because his contract was entire and he voluntarily abandoned his work, without valid excuse, before the end of the stipulated time. *Koplitz v. Powell*, 56 Wis. 671.

This proposition of law was substantially correctly stated in the following instruction, which was offered by the defendant: "You are instructed that if Mr. McKillop left his work, under and pursuant to the agreement of the day men and the hourly men on the night of July 8, 1896,— that is, to quit at noon, July 9th, if defendants did not concede to the proposition submitted to them on July 8th, then plaintiff cannot recover, and your verdict shall be for the defendants."

The court read this instruction to the jury, and added the following words: "That is, if that was the reason he quit, and the danger was not such — that the danger or apparent danger was not such — that the man of ordinary nerve would have refused or declined to go on with the work, your verdict will be for the defendants."

We think that the addition of this limitation to the instruction was error. Irrespective of the statute which requires an instruction to be given as asked or refused in full (R. S. 1878, sec. 2853), we think the plaintiffs in error were certainly entitled to have the instruction which they asked given without dilution or qualification. The proposition was that, if Mr. McKillop quit in pursuance of the agreement to strike, he could not recover, and the jury should have been so informed plainly and directly, without being required to determine, in addition, what would have been the condition of mind of a hypothetical man who perhaps had entered into no agreement to strike. The last clause added a confusing element to a simple proposition, and it was error to attach it to the instruction as asked.

A more important and vital question, however, is yet to be considered. There was a motion to direct a verdict for

the plaintiffs in error, which was overruled and exception taken; and this raises the question whether, in any view of the case, the defendant in error is entitled to recover. It seems to have been assumed upon the trial below, and upon the argument in this court, that, if McKillop was excused in leaving the defendant's service on account of the threats of strikers to do him bodily harm, he can recover for the time of his actual service, without deduction for damages suffered by the master by reason of his breach of contract. Such is certainly not the law. If a servant is prevented from performing his contract by the act or fault of the master, the master cannot, of course, recover or recoup any damages, because the breach is his own. Wood, Master & S. (2d ed.), § 148. But, in case the servant is prevented from fulfilling his contract for personal services by his own sickness, this is not the fault or act of the master, and while the servant will generally be excused from fulfilling his contract and be entitled to recover for the labor performed up to the time of his sickness, the master will be entitled to counterclaim his damages for the breach of contract, for which he (the master) was not responsible. The justice of the rule is apparent on a moment's reflection. Wood, Master & S. (2d ed.), § 122.

Now, it may well be that McKillop would be justified in quitting if the danger of bodily injury was real and imminent, and the threats of the strikers were so serious that a reasonable man in McKillop's situation would have been justified in believing that he was in imminent danger if he continued to work; for it can hardly be claimed that a man must daily carry his life in his hand in such a manner. Still, this condition of things was a condition for which the master was in no way responsible. If it operated to relieve McKillop from his obligation to work the entire season, still it manifestly could not operate to give him any greater right against his employer than as though he had been relieved of

his contract by sickness or *vis major*, for which his employer was not responsible. It is still the employee, and not the employer, who breaks the contract; and the rule that the party who breaks an entire contract shall have no recovery by reason of his part performance of it is relaxed only to the extent of permitting recovery of compensation for the actual benefit conferred upon the employer, or, as more usually expressed, by allowing the employee the value of his services after deducting the damages, if any, suffered by the employer by reason of the breach of the entire contract.     Wood, Master & S. § 122; *Fenton v. Clark*, 11 Vt. 557; *Hubbard v. Belden*, 27 Vt. 645; *Patrick v. Putnam*, 27 Vt. 759; *Ryan v. Dayton*, 25 Conn. 188; *Wolfe v. Howes*, 20 N. Y. 197–203; *Clark v. Gilbert*, 26 N. Y. 279; *Allen v. McKibbin*, 5 Mich. 449–455.

In the last-cited case (*Allen v. McKibbin*) the court tersely states the rule as to the measure of recovery thus: " Without reviewing the cases in detail, we think that the only rule which harmonizes them may be laid down substantially as follows: The defaulting plaintiff can in no case recover more than the contract price, and cannot recover that if his work is not reasonably worth it, or if, by paying it, the rest of the work will cost the defendant more than if the whole had been completed under the contract.     The party in default can never gain by his default, and the other party can never be permitted to lose by it; and the price thus determined is the true amount recoverable on a *quantum meruit.*"

The recovery, then, in the most favorable aspect of the case, is limited to the amount of McKillop's wages at the agreed rate, less any damages resulting to the employer from the termination of the contract.     Those damages are stipulated and fixed.     The language used in the written agreement is apt, and clearly expresses the understanding that the damages recoverable for a termination thereof shall be fifteen days' wages.     The consequences of a ter-

mination of this contract of employment were eminently of
the character to justify stipulation of the damages in ad-
vance. Uncertainty as to the possibility and expense of find-
ing another employee, and as to the wages to be paid if one
be found; uncertainty as to the extent of interruption or
embarrassment of the numerous other employees, joined with
the uncertain, but possibly very large, liability to vessel own-
ers or shippers which might be imposed upon defendants by
interruption of their work, the apportionment of which dam-
ages to each, should several of the contracting employees
quit at once, would be extremely difficult and intricate,— all
these elements bring the situation within the rule adopted
in *Berrinkott v. Traphagen,* 39 Wis. 219, 226.

The damages stipulated by the contract equal the amount
of the defendant in error's demand, and therefore, upon the
most favorable view of the evidence, preclude any recovery.
A verdict for the plaintiffs in error should have been directed,
and the verdict for the defendant in error should have been
set aside.

*By the Court.*— Judgment reversed, and action remanded
for a new trial.

