CITY OF MADISON, Respondent, vs. AMERICAN SANITARY ENGINEERING COMPANY and another, Appellants.

*March 2—July 3, 1903.*

*Municipal corporations: Sewage disposal works: Contracts: Bonds: Construction: Breach: Penalty: "Penal sum": "Liquidated damages": Architects and engineers: Powers and duties: Acceptance: Waiver: Entire contract: Failure of consideration: Evidence: Ultra vires: Principal and surety: Release of surety: Material alteration of contract: Extension of time.*

1. The words "penal sum" in that part of a contract or bond providing for the consequences of a breach thereof are ordinarily to be construed strictly, and as meaning a penalty and nothing more, and, in such case, actual damages must be shown. This ordinary import may be overborne by other parts of the contract which demonstrate that the words were used as meaning "liquidated damages."

2. If the sum mentioned in that part of a contract or bond providing for the consequences of a breach be denominated "liquidated damages," that fact will not be conclusive upon courts; if the sum fixed be largely in excess of actual damages, or if it appear that the sum was fixed to evade usury laws or to cloak oppression, it will be construed as a penalty.

3. In such case, where the sum fixed is excessive, and the damages are wholly uncertain and incapable of ascertainment by any known rule, the courts will consider the sum named as liquidated damages.

4. A contract under which an engineering company agreed to instal a sewage purification plant for a city, with certain guaranteed results, provided that, "for the faithful execution of this contract and to make good these several warranties," the contractor should give to the city a bond for $25,000, to the effect that each enumerated warranty was a specific warranty, and the principal consideration of the contract, "and that on the failure of the company to make good any one of said warranties the said bond shall be forfeited to the said city." The bond was in the "penal sum" of $25,000, and was conditioned that if the company fully performed "all" the covenants of the contract it should be void. The bond and contract were drawn and scrutinized by lawyers before acceptance. Some of the numerous conditions of the contract were trivial in their nature, and there was embodied a stipulation that if the plant was

not completed within a certain time the company should forfeit the sum of $25 per day as "liquidated damages." *Held*, that it necessarily appeared that the parties had in mind the difference between liquidated damages and penalty, and that the sum named in the bond must be regarded as a penalty.

5. A contract by an engineering company to construct a sewage purification plant for a city, after providing that the work should be completed in strict compliance with the plans and specifications, stipulated that the engineering company should operate the works for three months after the date of their completion, at its own expense, and, after the expiration of that time, if the plant was working "to the satisfaction of the said city engineers," the city should assume running control and operate it for nine months before accepting the same. The contract then proceeded to specify the degree of purification which the engineering company contracted to produce when the plant was working to its full capacity. *Held*, that the city was contracting for a plant to purify sewage, not a mechanically correct piece of machinery, and was not bound to accept the plant after three months, and give it the nine-months trial if it was mechanically satisfactory, irrespective of the degree of purification of sewage accomplished.

6. In such case, the proof was conclusive and undisputed that the plant completely failed to dispose of the sewage of the city with the results contracted for. *Held*, that the city engineers had no power under the contract to declare themselves satisfied with the plant, whatever may have been their opinion as to their powers and duties, and, irrespective of such engineer's report, the city was not compelled to take control at the end of the three-months period, and lost no rights by refusing so to do.

7. A contract by an engineering company for the construction of a plant for the purification of sewage for a city provided, if the plant failed to operate as agreed, that the city should have the use of the plant free of cost for one year after its refusal to accept the same. The plant was to be operated three months by the company after its completion, and then, if satisfactory to the city engineers, the city was to operate it nine months before final acceptance. On September 29, after three months' operation by the engineering company, the plant was tendered to the city for the nine-months trial, and, on the report of the city engineers, the tender was refused. On January 12, following, the engineering company ceased operating the plant and abandoned it. The city engineers reported these facts, and also that the plant was not giving the guaranteed results,

whereupon the city by resolution reciting the facts and the necessity of disposing of the sewage, but disclaiming any acceptance, took charge of and operated the plant for about a year, until another could be constructed. *Held*, that the city was acting within the contract, and no waiver of any rights under the contract or an acceptance of the plant could be predicated thereon.

8. Where a city contracted for a complete sewage purification plant, guaranteed to produce certain specified results, and the plant as an entirety was a failure, and did not dispose of the sewage with the guaranteed results, there is an entire failure of consideration, notwithstanding some parts of the plant performed their work satisfactorily.

9. In an action for breach of a contract in failing to construct a sewage purification plant so as to accomplish guaranteed results, it is not error to refuse to strike out various analyses of the effluent, because it appeared that such effluent was taken at times when sewage was being wasted, and was not all passing through the filter beds, where it did appear that the samples of the effluent were taken from the proper place at times when the plant was in regular operation, and sewage was passing through in regular course.

10. While taxpayers whose money is about to be spent, or property owners whose land is about to be charged, may challenge the legality of municipal acts, and contracts calling for expenditures, on the ground that the proper legal steps have not been taken, persons who enter into a contract with the city stand in a different position. Such persons cannot make the defense of *ultra vires* or total lack of power on the part of the city to make the contract in question.

11. Where a surety company, by the express terms of its bond, has made a contract with a city a part of the bond, it cannot be heard to say that the city had no power to enter into the contract or did not make the contract in the required manner.

12. A contract with a city for a sewage disposal plant provided that payments should be made as the work progressed, on monthly estimates by *two* designated engineers, but such payments were made on the certificate of *one* engineer alone. A surety company, who had given a bond guaranteeing the contract, interposed such fact as a defense. It appeared that such provision was inserted in the contract for the benefit of the city alone, and that the payments so made were not greater in amount than they should have been if the certificate of both engineers had been exacted. *Held*, that such pay-

ments did not materially alter the contract, nor affect the rights of the surety.

13. Such contract further provided that the time for completion "may be extended only by the previous written consent of the mayor and city engineer for good cause shown." *Held*, that such language did not limit the designated officers to granting only one extension, either by direct terms or by implication.

14. When a contract for the construction of a sewage plant for a city, guaranteed by the bond of a surety company, was entered into, the expectation was that the city would furnish the power for its operation from a certain water power owned by the city. The only reference to the power in the contract was, that the cost of operation "as the city now proposes to operate the plant shall not exceed" a certain sum. After the contract had been entered into the city installed gasoline engines for power purposes, and thereby produced the required power. *Held*, that the terms of the contract were not affected by the change of power so as to release the surety.

APPEALS from a judgment of the circuit court for Dane county: ROBERT G. SIEBECKER, Circuit Judge. *Affirmed*.

This is an action at law to recover $25,000 for breach of a bond given to the plaintiff by the defendant engineering company as principal and the defendant fidelity and guaranty company as surety to secure the performance of a contract made by the engineering company with the plaintiff by which the engineering company agreed to construct and install a sewage purification plant for the use of the city and guarantee certain results.

The complaint alleged the making of the contract and bond; also that the engineering company had constructed a plant, and that the plaintiff had paid the engineering company the sum of $25,000 during the progress of the work, in accordance with the terms of the contract, no part of which has been refunded. The complaint further charged that the engineering company had failed to perform its contract, and alleged eleven substantial breaches thereof, and that the plant

as constructed was without use or value to the plaintiff, and demanded judgment for the sum of $25,000 and costs.

The engineering company, by answer, admitted the execution of the contract and bond; the construction of the plant; the payment by the city of $25,000 upon the contract, and that no part thereof has been repaid; but denied all breaches of the contract, and alleged acceptance of the plant by the city. It also counterclaimed to recover the balance of the contract price, amounting to $12,200, and set forth other counterclaims, which are unnecessary to be stated.

The answer of the guaranty company admits the execution of the contract and bond, and alleges that the city accepted the plant; also that the city and the engineering company made certain material changes and variations in the contract, by which the guaranty company has been released from the obligations of the bond.

The plaintiff filed a reply denying the allegations of the counterclaims, and alleged that the engineering company was a foreign corporation, and had not filed a copy of its charter with the secretary of state, as required by sec. 1770b, Stats. 1898, and hence could claim no rights against the city under its contract.

The action was tried before a jury. Many of the material facts were undisputed, and much of the proof was of a documentary nature. It appears that the city of *Madison* is located between two small lakes, known as Lake Mendota (sometimes called Fourth Lake), and Lake Monona, which are connected by a small river a little more than a mile in length, known as the Yaharra or Catfish, Lake Monona being the lower lake; that the city had for years had a sewerage system by which the sewage was conducted into these lakes, the far larger percentage being deposited in Lake Monona; that some years prior to the making of the contract and bond in suit the city council had determined upon a change in the method of sewage disposal, so that the same should not be

turned into the lakes, for the reason that the water of Lake Monona was seriously polluted by the sewage discharged into it, and actions were commenced against the city to enjoin the discharge of sewage into that lake; that in October, 1895, McClellan Dodge, city engineer, and Capt. John Nader, also a civil engineer, in response to a request of the city council, submitted plans for the disposal of all of the sewage of the city by means of chemical treatment and filtration; that these plans contemplated the collection of all the sewage of the city by means of intercepting sewers which conveyed the sewage by gravity to the disposal grounds in the northeast part of the city, just across the Yaharra river, there to be chemically treated, and run into tanks for settling, and thence onto specially prepared filter beds of sand three and one-half acres in extent, after which process the purified effluent was to be discharged into the Yaharra river about half a mile above Lake Monona; that the council approved these general plans, and directed the engineers to prepare detailed plans and specifications, which were finally approved by the council in February, 1897; that early in 1897 work was commenced by the city in the execution of these plans, and in October of that year the large intercepting sewer which was to carry the sewage to the works had been partially constructed, and at this juncture John MacDougall, the managing director of the engineering company, came to the city, was fully informed of the proposed change in system, and submitted to the city council a proposition for the installation of a plant for sewage disposal by the use of certain patented devices and processes owned and controlled by the engineering company, known as the "International" process of sewage purification; that this process also contemplated the use of the intercepting sewer and of chemical treatment and settling tanks and filter beds, but that different chemicals were to be used and patented devices installed, whereby quicker action was to be obtained, and very much smaller filter beds made necessary;

that the engineers Dodge and Nader accompanied this proposition with a report recommending the acceptance thereof, and stating the difference between the two plans, as follows:

"The two essential differences in the plans are, first, the use of deep, circular tanks instead of shallow rectangular tanks, in which the precipitation takes place, and the possibility by means of a patented device in connection with the former of removing the sludge without emptying the tank, thus avoiding considerable disagreeable work and the expense thereof, and also the loss of the use of the tank during the operation; second, the much more rapid filtration of the effluent from the precipitation tanks, owing to the use of a powerful oxidizer named 'Polarite,' used in connection with the sand of the filters. By the use of these filters, and the consequent increased rate of filtration possible, the size of the plant is much reduced, the works condensed, the operation simplified, the cost of operation decreased, and at the same time doing away with the necessity of purchasing more land, as the tract now belonging to the city is ample for all time."

After some delays the proposition of McDougall was accepted, and on the 18th day of April, 1898, a written contract was entered into between the city and the engineering company, which after reciting the making of the proposal aforesaid, and making the same a part of the contract, proceeds as follows:

"Now, therefore, it is mutually stipulated and agreed by and between the *American Sanitary Engineering Company* of Detroit, Michigan, and the city of *Madison,* as follows, to wit:

"That the sole purpose of putting in the sewage purification plant is for the purification of the sewage of said city so that the effluent may be turned into Lake Monona without contaminating the water in said lake, or causing or aiding vegetable growth in said lake, and without injury to the fish therein.

"The said engineering company agrees to erect and construct a sewage purification plant on the international sys-

tem for and in the city of *Madison,* on the city property
across the Yaharra river and about one hundred feet north-
east of the so-called 'Y' of the Chicago & Northwestern Rail-
way, and about four hundred feet northwest of Washington
avenue, at a point to be more particularly located by the
mayor and city surveyor of said city, on the following terms
and conditions:

"The plant to be constructed generally on the plans sub-
mitted with the proposal of said company, and accepted and
adopted by the common council of said city, and in strict
compliance with the detail plans and specifications approved
by the city's sewerage engineers and now on file in the office
of the city clerk, which are here referred to and made a part
of this contract to all intents and purposes as if herein spe-
cifically set forth. The plant shall consist of four Candy
precipitation tanks, twenty-five feet inside diameter and fif-
teen feet deep; three polarite filter beds, aggregating sixty-
six feet by ninety-two feet outside dimensions; all grading,
channels, piping, valves, and other appurtenances complete;
the same to have a capacity of treating 1,200,000 gallons of
sewage per day; for the sum of thirty-seven thousand and two
hundred (37,200) dollars. The work shall be done in strict
and full compliance with the plans and specifications submit-
ted with said proposal and the perfected and detailed plans
and specifications since approved by the city engineers and
now on file in the office of the city clerk. The work of con-
struction shall in every particular be carried on and com-
pleted in a workmanlike manner, under the supervision of
the said engineers and to their satisfaction. Said engineer-
ing company agrees to operate the works for three months
after the date of their completion at the expense of said com-
pany. If said plant is working to the satisfaction of the said
city engineers at the expiration of said three months, the city
shall, at its expense, without accepting the same, assume the
running control of said plant and shall continue to operate
the same as directed by said company for a period of nine
months before accepting the same. Said company specifically
agrees and warrants to produce a degree of purification in the
effluent from the filters, even when the plant is working at its
full daily capacity, as follows, to wit:

"(1) The effluent shall be at least as pure in all respects as the effluent from the sewage of the city of *Madison* would be if treated with lime, alum, or copperas, or lime and alum, or lime and copperas, or any combination of these, at the discretion of the city surveyor, and afterwards filtered through five feet of specially prepared beds of sand, as heretofore proposed by said engineers, at the rate by them proposed.

"(2) That when the said purification plant is properly operated the effluent, as it passes from the polarite filter beds, shall be satisfactory to both of said sewerage engineers; that is, McClellan Dodge and Captain John Nader, or the survivor of them, and that on chemical analysis it shall be as pure as the water of Fourth Lake, as shown by an analysis of said water made by Prof. Daniells, of the State University, at the request of the city, in the year of 1888 and published in the water commissioner's report of that year.

"(3) That the effluent passing from said plant may be turned into Lake Monona without in any way contaminating the waters of said lake, without causing or contributing to vegetable growth in said lake other than as pure water may contribute to such growth, and without in any manner doing injury to the fish therein.

"(4) That the operation of said plant shall cause or produce no objectionable or offensive odors or nuisance in or about said plant, the Yaharra river, Lake Monona, or in or about any other place.

"(5) That said purification plant shall work in all other respects in a manner satisfactory to the said engineers of said city.

"For the faithful execution of this contract and to make good these several warranties, the said company shall give the said city a good and sufficient bond in the sum of twenty-five thousand (25,000) dollars, to the effect that each of said warranties is a specific warranty and the principal consideration for the giving of this contract, and that on the failure of the company to make good any one of said warranties, the said bond shall be forfeited to the said city. Said bond shall be given by some reliable fidelity and trust company duly authorized to issue bonds and shall be given before this contract shall be binding on either party, and it shall be duly approved by the mayor and city attorney, and shall be of force and ef-

fect until said plant shall have been duly and finally accepted by the said city.

"The said engineering company agrees that the foregoing prices are to be in full for the plant and that the city shall not be subject to any further charges of any kind whatsoever on any patented article in connection with said plant or chemicals used, excepting the charge for ferozone, as hereafter specified. The said company further guarantees that it will save the city harmless and free from any action at law which may arise in connection with the infringing of any patent in connection with the plant, materal, or chemicals supplied by it.

"Said sanitary engineering company further stipulates and agrees that said purification plant shall have a daily capacity of purifying 1,200,000 gallons of the sewage of the city of *Madison* per day for each day in the year; that said plant shall be completed and ready for operation on or before October 15th, 1898, it being understood and agreed that the above date is of the essence of this contract; that the time for the completion thereof may be extended only by the previous written consent of the mayor and the city engineer, for good cause shown, which cause, together with the original of said consent, shall be filed with the city clerk. It is further understood and agreed that the said company shall forfeit to the said city the sum of twenty-five (25) dollars per day as liquidated damages for the noncompletion of said plant at the time herein agreed upon, unless said time shall be extended as aforesaid; that in making a test of said plant at its full capacity of 1,200,000 gallons per day, such part of said tanks and filters shall be used so as to make them work at the rate that the entire plant would work if receiving 1,200,000 gallons per day, and like tests may be made of the results that would be obtained by the lime, alum or copperas test, with sand filters.

"It is further stipulated and agreed by the said company that the cost of operating said plant, including labor, chemicals and other necessary supplies, as the city now purposes to operate its plant, shall not exceed the estimated cost of the operation of the plant heretofore proposed by said engineers, to wit: the sum of three thousand six hundred (3,600) dollars per year; and said company further agrees that the cost

of operating said plant shall not exceed that sum when purifying 600,000 gallons of sewage per day, it being understood and agreed that said sum includes the cost of ferozone used in such treatment, and that the cost of treating any increase in the sewage beyond that amount shall not exceed the proportion which the amount of ferozone then used shall be to the ferozone used in treating 600,000 gallons at the above figure up to the capacity of the plant. Said company further agrees to furnish to said city ferozone for the operation of said plant for one year at cost, laid down at the city of *Madison,* and agrees thereafter to furnish ferozone for the operation of said plant at a cost that shall not exceed the cost of alum or lime, or copperas, or any combination of these the city might see fit to use, for treating a like amount of sewage with as favorable results, and that the cost of sufficient ferozone to properly treat the sewage of the city of *Madison* shall at no time exceed the sum of fifteen hundred (1,500) dollars per annum for treating 600,000 gallons of sewage per day. Said company further agrees that any extension of said plant or any part thereof shall be made by the said company, its successors or assigns, at not to exceed the relative cost of like work under this contract.

"The said company further agrees that the said purification plant shall be completed in all respects agreeable to the said plans and specifications, under the supervision of the city engineers, at the agreed price of thirty-seven thousand two hundred (37,200) dollars; that the sum of twenty-five thousand (25,000) dollars shall be paid to said company as the work progresses, on the monthly estimates and certificates furnished by the city engineers (an original copy of which shall be placed on file with the city clerk), it being understood that not more than twenty-five thousand (25,000) dollars shall be paid hereon until after the completion of said work by the said company and the final acceptance of said plant by the city of *Madison;* that the balance of said contract price, to wit, the sum of twelve thousand two hundred (12,200) dollars, shall be paid to the said company on or before one year after the final acceptance of said work, and that said sum shall draw interest at six per cent. after the completion of said works, if said works are finally accepted by said city, it being understood and agreed that the said

sum of twelve thousand two hundred (12,200) dollars shall
not become payable until the acceptance of said plant by the
city of *Madison.*

"It is understood and agreed that at the expiration of the
year of trial herein provided for and before the said works
shall be finally accepted by the said city, the effluent as it
leaves the filter-beds shall be satisfactory to Dr. Phil Fox,
health physician of said city, Hon. Robert G. Siebecker,
judge of the Dane county circuit court, and McClellan
Dodge, city engineer of said city; that the analysis of the
effluent herein provided for shall be made by either Dr. Bab-
cock or Prof. Daniells of the State University, as the gentle-
men above named shall select, and the effluent on such anal-
ysis shall be found to be equal to the waters of Lake Men-
dota, as hereinbefore provided; that the said Dr. Phil Fox,
Robert G. Siebecker and McClellan Dodge shall be satisfied
that there shall be no nuisance in or about said plant, the
Yaharra river, or Lake Monona, caused by the operation of
said plant, and that if either of said three persons named,
for any reason or at any time, shall decline or be incapaci-
tated to act as herein provided, a substitute shall be chosen
by agreement between John A. Aylward, representing the
city of *Madison,* and H. W. Chynoweth, representing the
said company on the one side, and Burr W. Jones, John M.
Olin, and R. M. LaFollette, representing the plaintiff upon
the other. If either of the chemists herein named shall re-
fuse or fail to serve, then the said Fox, Siebecker and Dodge,
or their substitutes, as herein provided for, shall select some
other chemist to perform the said services herein provided
for.

"As the sewage system of said city is so constructed that
all sewage is conducted to said plant, it is understood and
agreed that the operation by the city of said plant before
final acceptance, shall in no manner be construed as an ac-
ceptance of the said purification plant, or any part thereof,
and shall in no manner and at no time work a waiver of any
of the rights of the city as against the said company, or its
successors.

"The said company further agrees to save the city harm-
less from all claims of injury or damage, or claims of what-
soever nature, in any manner growing out of this contract.

Before final payment shall be made the company shall satisfy the city that all claims for labor, damages, implements or materials have been paid and satisfied in full.

"It is understood and agreed that no extra work shall be allowed or paid for unless the same shall have been done on the written order of the city engineer and the mayor of said city and the price agreed upon and signed by both parties hereto prior to the doing of such work, and filed with the city clerk. The said company assumes all risks arising from any latent defects that may be in the soil where the said works shall be located as aforesaid, but it shall have reasonable compensation, to be fixed by the said city surveyor, for handling the water 'in said work over what the same would have cost had this contract been carried out when said company made its said proposal.

"In consideration of the foregoing agreements, covenants and warranties to be performed by said company, the city of *Madison* agrees to pay to said *American Sanitary Engineering Company* the sum of thirty-seven thousand two hundred (37,200) dollars for the full and satisfactory completion of said plant on the terms and in the manner and at the time as herein set forth, it being understood and agreed that the said sums hereinbefore mentioned shall become due and payable only on the conditions herein set forth.

"It is also understood and agreed that should the said company fail to complete the work as herein agreed on, or should the said plant fail to operate as hereinbefore specifically agreed upon, the said company shall have no claim upon the unpaid contract price and the said bond shall be forfeited to the city of *Madison,* and in such case the city shall have the use of said plant, free of cost, for the period of one year after the city's refusal to accept the same, and in such case the city shall also have the option of purchasing any portion of said plant at the actual cost price of such portion, exclusive of the cost of any patented article or device therewith connected.

"It is further mutually agreed that the city is under no obligation to the said company to use ferozone as the coagulent in the operation of said plant, or to use polarite in its filter beds.

"It is further hereby stipulated and agreed by and between the parties hereto that the price named for the 'construction and completion of said plant and works as to be paid to the company by the city was fixed and agreed to by the company not as the price at which the said company contemplated or now contemplates establishing similar works; that the said price was fixed as above in said contract by reason of the fact that no such plant or works have up to this time been built or constructed in this country and none such are in operation here, although such system is in successful operation in other countries; that the inducement to the company in fixing the said price at said figure is solely and mainly that it might immediately construct and put into operation here in the city of *Madison* a model plant and works for the treatment of the sewage of the city on the international plan and make such plant and works an advertisement of such system and to which they could refer and which they could show to the citizens and officers of other municipalities contemplating putting in a system of works for the treatment of sewage, as works and a plant in successful operation; that unless the construction of the said works can be begun by the 15th day of May, 1898, and proceeded with to completion, the foregoing inducements will be removed as a consideration for the price fixed in this contract and the company shall be obliged to erect works in some other point in this country for a model and an advertisement; that if by reason of suits now pending or that might hereafter be instituted, by which the said company would be prevented from commencing the work under this contract on or before the 15th day of May, 1898, and proceeding to the completion thereof without interruption, then and in that case the contract price mentioned herein shall not be binding on the said company and it shall be necessary for the said company and the said city to agree upon a new contract price for the work herein contemplated to be performed prior to the commencement of such work. It is understood and agreed that this contract shall not be assigned without the consent of the said city."

It further appears that, in order to secure the fulfillment of the terms of this contract, the bond in suit was executed

June 27, 1898, and accepted by the city in July, 1898, which bond is in the penal sum of $25,000, and conditioned as follows:

"The condition of this obligation is such, that whereas, the above-named *American Sanitary Engineering Company*, a corporation organized and doing business under the laws of the state of Michigan, has entered into a contract with the said city of *Madison* for the purpose of furnishing all the material and performing all the work and other agreements, covenants and warranties in said contract contained, for the erection and operation of a sewage-purification plant for and at the said city of *Madison*, according to said contract and the plans and specifications incorporated therein and in accordance with all the terms of said contract, which said contract is hereto attached and made a part hereof as if herein fully set forth:

"Now therefore, if the said *American Sanitary Engineering Company* shall in all things faithfully and fully keep and perform all the covenants, conditions, warranties and agreements and all things of every nature whatsoever by it, the said *American Sanitary Engineering Company*, to be performed and kept in accordance with the terms and conditions of said contract and the said plans and specifications mentioned in said contract between the said city of *Madison* and the said *American Sanitary Engineering Company*, bearing date the 18th day of April, A. D. 1898, then this obligation is to be void, otherwise of full force, virtue and effect."

The engineering company commenced building the plant in June or July, 1898. October 14, 1898, the mayor and city engineer executed a written extension of time for the completion of the work until December 15, 1898, giving as reasons that it had been impossible to commence work until July, and that the grounds were not in as good condition for work as had been anticipated. On the 15th day of December the time for completing the contract was again extended in writing by the same officers until February 1, 1899. The plant was practically completed by January 10, 1899, but it seems that it was not considered wise to start the works in

midwinter, and it was not until May 19, 1899, that the sewage of the city was turned into the plant and its operation was begun. As completed, the plant was composed of two separate parts, one built and operated by the city, and one built and operated by the engineering company. That part built by the city contained the power for operating the plant, the press for pressing the sludge, the receiving well for the sewage, the mixing tank for mixing chemicals, and the well into which the sludge was drawn off from the chemical precipitation tanks, and from which well it was pumped into the press and pressed into cakes. The buildings erected by the engineering company consisted of four circular precipitation tanks, about fifteen or twenty feet in diameter, and about the same in depth. Next to the precipitation tanks were three oblong rectangular tanks built of masonry, which contained the filter beds. The filter beds were constructed by laying on the bottom tile, and on top of the tile crushed granite, polarite, gravel, and sand, so as to make a porous filter, and from which the sewage after it passed through the chemical precipitation tanks flowed. The course of the sewage through the plant was as follows: The sewage was delivered into a deep well under the power house, called the "sewage well," being delivered from the sewers by gravity. Chemicals consisting of ferozone, sometimes, most generally, lime, were delivered and mixed with the sewage in the well, and the sewage was then pumped from the sewage well into a pipe, which conveyed it to the circular precipitation tanks. The sewage entered these precipitation tanks at the bottom, and gradually flowed to the top of the tank. During this process whatever solid matter had been precipitated by chemicals collected at the bottom, from whence it was pumped by a patented device into the sludge well, which was in the part of the plant constructed by the city. The supernatant fluid in the precipitation tanks, as it rose above a certain level, was conveyed by channels prepared in the masonry, by gravity, onto the top of

the filter beds, and from thence it passed by gravity through the filters, and was collected at their bottom into a pipe called the "effluent pipe." This pipe at first discharged into the marsh surrounding the plant, but afterwards was connected with a pipe or channel which conveyed it directly into the Yaharra river. The sludge which was collected in the sludge well was pumped into a press called the "sludge press," and the excess of water in the sludge extracted by pressure, and this water was run back again into the sewage well for re-treatment. The sludge, after pressing, was deposited in the marsh. As the work progressed, estimates and certificates were given to the engineering company from time to time, and payments made upon the contract, until the entire amount of $25,000 was paid, the last estimate being given July 12, 1899. These estimates were all signed by Mr. Dodge alone, though Capt. Nader was aware that they were given. When the operation of the plant was first begun the engineering company used ferozone as a precipitant, but it was found impracticable to press the sludge produced, and after about six weeks lime was substituted, and the use thereof continued, with the result that the sludge could be readily pressed, but was largely increased in quantity. The plan for cleaning the filters also failed to work successfully, and other means were devised by which large amounts of water were wasted. September 28, 1899, the engineering company, having operated the works more than three months, tendered the same to the engineers under that clause of the contract providing that if the plant be then working to the satisfaction of the engineers the city shall assume control and operate the same for nine months. Thereupon, and on the 17th of October, 1899, the engineers made the following report to the city council:

"Gentlemen: The *American Sanitary Engineering Company* have operated the sewage disposal plant for three months, and some time since tendered us, under the terms of its contract with the city, the running control of the plant.

Since then we have made an examination of the workings of the plant, although we have had a general knowledge of what has been going on there all the time.

"The plant as installed has been completed in a workman-like manner and to our satisfaction, except in one or two minor matters that the company will remedy before the time for final acceptance.

"As at present operated the plant is working to our satisfaction, to this extent, that it is producing a reasonably good degree of purification in the effluent, and is not causing, and when properly handled we believe will not cause, any objectionable odor or a nuisance of any kind.

"While the plant is not yet reaching the results guaranteed by the contract, yet we believe that the plant is doing such work as warrants us in assuming the running control of it at this time. Under the terms of the contract the city is given nine months in which to test the practical workings of the plant before it is called upon to decide whether it shall finally accept it or not. As we understand the contract, the city assumes no risk, and waives or forfeits no rights, in assuming the running control of the plant at this time.

"While the plant is doing good work, we are satisfied that during the period of trial it can be made to do still better work.

"Without waiving the right of the city to insist on a full and strict compliance on behalf of the company with all the terms of the contract, we recommend that the city assume the running control of the plant at this time, under the terms and as provided by the contract."

Prior to the making of this report the engineers had asked the engineering company for chemical analyses of the effluent, but they had not been furnished, and the engineers proceeded to cause analyses of the effluent to be made during October and November by the experts named in the contract, and by other experts, all of which showed that the effluent produced was not as pure nor substantially as pure as that guarantied by the contract. The city declined to take charge of the works. December 8, 1899, the city council directed the sewerage engineers to report whether the plant was working

to their entire satisfaction, and in response to this Mr. Dodge reported on December 13th as follows:

"Gentlemen: In compliance with your instructions of the 8th inst. I have the honor to submit the following report concerning the sewage disposal plant:

"Two months ago, when the sewerage engineers reported to the council that the sewage disposal plant was running to their satisfaction to a specified extent, and recommended that the city assume the running control thereof in accordance with the terms of the contract, the plant had at all times been able to care for, and had cared for, all the sewage received at the works; there had been no serious clogging of the filters, and although it was evident that the filters as operated had not sufficient capacity to properly treat the guarantied amount of sewage, viz. 1,200,000 gallons per day, the question of capacity could not properly be taken into consideration at that time.

"The contract does not specify that any test of the plant or analysis of the effluent thereof shall be made at the end of the three-months period, nor that the guarantees must be reached at that time, and we were advised that it was not necessary that said guarantees should be fully attained before the city could with perfect safety assume the running control of the plant. Nevertheless we were careful to state that the plant was not working to our entire satisfaction in order that there might be no misunderstanding, that the city's rights might in no way be jeopardized, and the city be left free to act as it deemed best.

"Since said report was made, the volume of sewage reaching the plant has increased with the addition of new territory, and the filters, as operated, have not been able to care for and have not at all times cared for all the sewage received at the works.

"In so far, therefore, as this is true, the plant is working in a lesser degree to my satisfaction than it was at that time, although now, as then, parts of the plant are working in a most satisfactory manner."

On the same day the council appointed a committee to confer with the officers of the engineering company, and see if the defects complained of could be remedied. This commit-

tee met the officers of the company, and the latter agreed to put in certain additional pumps, which it was thought would obviate difficulties experienced in the introduction of the lime and the washing of the filters, the mayor agreeing to recommend the payment of the expense of these changes if the plant was finally accepted. These changes were made, but the city still declined to take charge, and on January 12, 1900, the engineering company withdrew their men, and declined to operate the plant any longer. On the same day the engineers reported this fact to the common council, and, further, that the plant was not operating to their satisfaction, nor in compliance with the terms of the contract, and the council passed the following resolution:

"Whereas, the *American Sanitary Engineering Company* of Detroit, Michigan, has heretofore entered into a contract with the city of *Madison* for the construction of a sewage disposal plant in the city of *Madison;* and

"Whereas, said company has not constructed said plant as in said contract provided; and

"Whereas, said company has failed to comply with the terms of said contract in several essential and important particulars, among others that the cost of operating said plant is in excess of the guaranteed cost of operation; that the degree of purification is not equal to that guaranteed in said contract; that the capacity of the plant is not as guaranteed, and that in other respects said plant does not comply with said contract; and

"Whereas, the construction of said plant, the manner of operation, and the results obtained are not in compliance with said contract and are not and have not been to the satisfaction of the city engineers and are not satisfactory to the city of *Madison;* and

"Whereas, in reliance with the faithful performance of said contract the city has arranged its entire sewer system at great cost, so that all the sewage of said city is now conducted to said plant, where of necessity it must be treated and disposed of; and

"Whereas, the said company has neglected to comply with the terms of said contract; and

"Whereas, said city is now informed that said company, without tendering said plant to the city, has absolutely abandoned said plant, thus allowing all the sewage of said city to accumulate at said plant, and which condition, if allowed to remain, will result immediately to the great injury of said city and danger to people thereof.

"Now, therefore, be it resolved, that by reason of the necessity that exists, without accepting said plant or any part thereof, or waiving or intending to waive any of the rights of said city under the terms of said contract, and without waiving its right to insist on a full and strict compliance by the said company with all the conditions of said contract by it to be performed, the city surveyor be and hereby is instructed to take charge of said plant, abandoned as aforesaid, and operate the same until otherwise ordered.

"And be it further resolved, that unless the said company shall within a reasonable time from the date hereof again assume charge of said plant, and proceed with all diligence to fulfill the terms of said contract, the bond in the sum of twenty-five thousand (25,000) dollars of the *United States Fidelity and Guaranty Company* of Baltimore, Md., given by the said *American Sanitary Engineering Company* for the faithful performance of its said contract, shall be and become forfeited to and the property of the city of *Madison*.

"And be it further resolved, that a copy of this resolution be forthwith served on the said *American Sanitary Engineering Company,* and a copy thereof be forwarded to the *United States Fidelity and Guaranty Company,* Baltimore, Md."

In pursuance of this resolution, the city took charge of the plant, and it was operated under the direction of Engineer Dodge till April 12th, in the same manner as the engineering company operated it. During this time the filters were incapable of filtering the effluent which came to them from the precipitation tanks, so that large amounts of the liquid were necessarily daily discharged from the tanks without filtration. During this time the cost of operating the plant was at the rate of $6,466.56 per year. Prof. F. E. Turneaure succeeded Mr. Dodge as city engineer in May, 1900, and he assumed operation and control of the plant.

Under his control the results were practically the same as before. The precipitation tanks were sufficient in capacity, but the filter beds were incapable of filtering the effluent received, so that a large quantity of sewage, amounting to about one third of the average flow, necessarily turned into the effluent pipe without filtration. Turneaure ceased to use the filters November 28, 1900, because their value was not sufficient to warrant the expense of operating them. He ceased to use the entire plant January 1, 1901. During his management the cost of operating the plant was $6,515 per year. He took samples of the sewage and effluent in July and August, and caused analyses to be made thereof. The tanks and filter beds have not been used since January 1, 1901. For several months the sewage was turned directly into the Yaharra, and after that time the city installed a plant for the treatment of sewage by a different method, which it has since used.

It appeared also that the defendant guaranty company on the 27th of June, 1898, received a bond in the sum of $25,000, conditioned to indemnify it from all liability incurred by reason of signing the bond in suit, which bond was signed by the engineering company, and various private persons, who justified in the aggregate sum of $80,000, and that the defendant guaranty company produced this bond on the trial and tendered it to the plaintiff, duly assigned, and that the tender was refused.

The evidence introduced by the defendants did not controvert in any essential respect the evidence showing the substantial breaches of the contract. The engineering company introduced evidence tending to show that the engineers Dodge and Nader agreed on October 16, 1898, to take charge of the works on behalf of the city on the following day, but this was denied by the engineers. The guaranty company introduced evidence tending to show that the city did not let the contract to the lowest bidder, nor by vote of two-thirds of all of the

members of the council; also that it had no knowledge of certain alleged changes in the contract claimed to have been made between the city and the engineering company.

Motions to direct a verdict were made by the plaintiff and by both defendants. The court directed a verdict in favor of the plaintiff for $25,000, and interest from the time of the commencement of the action, and from judgment entered in accordance with the verdict so directed the defendants separately appeal.

For the appellants there was a brief by *H. W. Chynoweth* and *Lamb, Richmond & Lamb,* for the *American Sanitary Engineering Company;* briefs by *Lamb, Richmond & Lamb,* for the *United States Fidelity & Guaranty Company;* and oral argument by *Mr. Chynoweth* and *Mr. C. F. Lamb.*

For the respondent there was a brief by *Rufus B. Smith,* city attorney, *John A. Aylward,* and *R. M. Bashford,* and oral argument by *Mr. Aylward.*

WINSLOW, J.    The first serious question debated by the parties is whether the sum named in the bond in suit is a penalty, or whether it is liquidated damages. The plaintiff claims that it must be treated as liquidated damages, while the defendants maintain that it is strictly a penalty, and that although substantial breaches may have been shown the plaintiff cannot recover, because it has not shown the amount of damages resulting from such breaches.

It is well understood that the words "penal sum" in that part of a contract or bond providing for the consequences of a breach thereof are ordinarily to be construed strictly, and as meaning a penalty and nothing more, and that in such case actual damage must be shown, and it is also understood that this ordinary import may be overborne by other parts of the contract which demonstrate that the words were used as meaning "liquidated damages." *Yenner v. Hammond,* 36 Wis. 277. So, also, if the sum be denominated "liquidated dam-

ages," this fact will not be conclusive upon the courts; but if the sum fixed be largely in excess of actual damages, or it appear that the sum was fixed to evade usury laws or to cloak oppression, the courts will construe it as a penalty. *Berrinkott v. Traphagen,* 39 Wis. 219; *Seeman v. Biemann,* 106 Wis. 365, 84 N. W. 490. It is also said that where the sum fixed is excessive, and the damages are wholly uncertain and incapable of ascertainment by any known rule, the courts will consider the sum named as liquidated damages. See cases cited above; also *Walsh v. Fisher,* 102 Wis. 172, 78 N. W. 437; *J. G. Wagner Co. v. Cawker,* 112 Wis. 532, 88 N. W. 599.

Tested by these general principles, we are convinced that the sum named in the bond in the present case must be regarded as a penalty. In the first place, it is named as a "penal sum," which is the appropriate language for the designation of a penalty, and this fact has considerable significance when the agreement or bond is drawn and scrutinized by lawyers before acceptance, as in the present case. In the second place the bond is given to insure the performance of "all the covenants, conditions, warranties, and agreements" contained in the principal contract, which are quite numerous, and some of which are trivial in their nature. It is very manifest that, in the absence of language to that effect, the penal sum named cannot be construed as liquidated damages for the breach of one covenant or agreement and a penalty only for the breach of others. The agreement provides that the company shall save the city harmless from all claims or injury or damages growing out of the same, also that before final payment the company shall satisfy all claims for labor, damages, or materials, also to furnish all ferozone for the operation of the plant for a year at cost, and that the cost of ferozone thereafter shall not exceed a certain amount. Suppose that any one or all of these agreements be breached, the damages suffered would be readily ascertainable, and if such

damages only amounted to a few hundred or even a few thousand dollars could it be reasonably argued for a moment that the entire penal sum of the bond must be recovered? Plainly not, yet such must be the result if the damages are liquidated. Another fact seems very significant, if not controlling, upon the question of the intent of the parties. The agreement provides that if the plant be not completed within the time fixed (or the time as extended in writing) the company shall forfeit the sum of $25 per day as liquidated damages for such default. This demonstrates that the parties had in mind the difference between liquidated damages and penalty, and presumably used both terms advisedly. Had the bond been given simply to insure the furnishing of a plant which would treat the city sewage with certain results, the argument that the sum named was intended as liquidated damages would have far greater force because the damages for breach of that agreement might be quite difficult of ascertainment, but given, as it was, to insure the performance of many different covenants and conditions, some of which are in their nature unimportant, and whose breach would inflict only trifling loss, we are compelled to construe the sum named in the bond as a penalty and nothing more.

Starting from this basis, the question presented is whether the plaintiff proved without dispute that it suffered damage to the amount of $25,000. The plaintiff proved without dispute that the sewage disposal plant erected by the engineering company not only technically, but substantially, failed to comply with the terms of its contract. Neither the company nor the city was ever able to operate the plant so that it would treat the city's sewage and obtain the guarantied results, or even an approximation of such results. The proof was conclusive and undisputed that the plant completely failed to dispose of the sewage of the city with the results contracted for. It was admitted that the city had paid the company $25,000 during the progress of the work. If, as claimed by the re-

spondent, there has been an entire failure to perform, and the city has in legal contemplation received nothing for its money, then damages to the extent of $25,000 .have been proven; otherwise not. This is really the main question in the case, and the decisive question so far as the defendant engineering company is concerned. The. appellants contend that the evidence shows that the plant was of some value, though some of the warranties may have been breached; that the proof also shows that the engineers were satisfied with the working of the plant October 16, 1899, and that it was then incumbent on the city under the contract to take the plant and give it nine months' trial; that the city had no right under the contract to take possession of the plant in January, 1900, and operate it for nearly a year; that such use was outside of the contract entirely; and that the city has thus received some benefit from the plant by use thereof as well as from its permanent retention.

The contention that the engineers were satisfied with the plant October 16, 1899, and that it was then the duty of the city under the contract to take the plant and operate it, requires examination and construction of the terms of the contract. The contract, after providing that the work shall be completed in strict compliance with the plans and specifications, further provides that the engineering company shall operate the works for three months after the date of their completion, at their own expense, and if at the expiration of that time the plant is working "to the satisfaction of the said city engineers" the city shall assume control and shall operate the same for nine months before accepting the same. The contract then proceeds to specify the degree of purification which the company contracts to produce when the plant is working to its full capacity.

The appellants contend that the contract does not mean that the plant should be doing the full work guarantied at the end of the three months in order to justify the engineers

in pronouncing it satisfactory, but simply that the engineers should think it "good enough to try" at that time. In effect, the claim is that if it was mechanically satisfactory, and if the sewage was going through it in some shape, the engineers were entitled to pronounce it satisfactory for the purpose of the nine-months trial, and that they did in fact so pronounce it. We cannot agree with these contentions. The mechanical workings of the plant were of course important, but every wheel might turn with the regularity of clockwork, and every valve and other device do its work with precision, and yet the sewage might come out of the operation as impure as it went in. The city was contracting for a plant to purify its sewage, not a mechanically correct piece of machinery. The contract shows the great anxiety felt to reach this end. It is not reasonable to suppose that in view of this important and overshadowing purpose that it was intended that the engineers should simply look over the mechanical operation of the various devices, and if this was satisfactory should then proclaim that the plant was working to their satisfaction, notwithstanding the effluent might be loaded with impurities, nor do we think that the words will bear that construction. A purification plant which does not purify cannot be a satisfactory plant. While it may be that slight irregularities or defects ordinarily incident to the operation of newly installed machinery and devices, or a trifling failure to come up to the full standard of excellence required, would not prevent the engineers from deciding that it was working to their satisfaction, we cannot subscribe to the idea that they had any power to make that declaration if there was a substantial failure of the plant to do the work as guarantied. This would mean that the city was to take an imperfect plant and experiment with it, and try to remedy its defects, and itself do what the contractors had agreed to do and failed. The city authorities contracted to receive a perfect and completed plant, and to operate it for nine months, in order to satisfy

themselves that it was perfect and substantially in accordance with their contract. They did not agree to allow alleged experts to try an experiment upon the city with new and strange devices, and take that experiment off from the hands of the experts before it was successful, and themselves enter the field of experiment and attempt to remedy defects. This being our construction of the contract, it is plain that the engineers had no power under the contract to declare themselves satisfied with a plant that was not substantially purifying the sewage of the city in the manner guarantied. The analyses which were made of the effluent produced abundantly show that the plant never at any time accomplished the guarantied results in the way of purification of sewage nor anything approximating those results. The report of the engineers dated October 17, 1899, affirmatively states that the guarantied results were not then reached, and all the evidence bears out the statement. Therefore whatever may have been the opinion of the engineers as to their powers or duties it is certain that the time never arrived when the plant operated to the satisfaction of the engineers within the meaning of the contract. Thus we reach the conclusion that the city was not compelled to take control of the plant at the end of the three-months period, and lost no right by refusing so to do.

The city did, however, assume control of the plant January 12, 1900, and operated it for nearly a year, and the question of the effect of these acts is still to be considered. It appears without dispute that this action was taken because of the abandonment of the plant by the company, and with the distinct statement that it was not accepted by the city. Thus the act seems plainly to be brought within that part of the contract which distinctly provides that in case the plant shall fail to operate as agreed the city shall have the use of the plant free of cost for one year after its refusal to accept the same. Irrespective of this provision, however, it would seem extremely doubtful whether the city's rights would be

in any way affected by the fact. The situation was extra-ordinary. By the construction of intercepting sewers, all of the city sewage was being taken to the plant. The sewerage system of a city must of necessity operate continuously. The city, it would seem, had no choice in the matter.. Its sewage must move on. It must move through the plant, or it must be discharged in a raw state into the Yaharra river, and thence into Lake Monona, with the result of creating a nuisance, and subjecting the city to lawsuits, and its citizens to danger of disease and malaria.,

To say that the acts of the city in thus assuming control of the works, and using them for a time, until other means of disposing of the sewage could be provided, constituted a waiver of any rights under the contract or an acceptance of the plant, is to torture acceptance and consent from acts done practically under duress. The works were on the city's own land. They were abandoned by the contractors while still absolutely inadequate and incomplete. There may doubtless be a voluntary acceptance of an incomplete building upon one's own land, but mere use thereof under circumstances of necessity such as are present here does not constitute acceptance or waiver of the terms of the contract. *Malbon v. Birney,* 11 Wis. 107.

The question whether the evidence showed the plant to be of no value, so that there was a total failure of consideration for the sums paid by the city, is now to be considered. The evidence tended to show that the settling tanks were sufficient in size and performed their work fairly well, but that the filter beds were entirely ineffective and insufficient in size, and continually became clogged, whether operated by the company or by the city, and they were finally abandoned as practically useless. From these facts the argument is that there was something of value in the tanks, at least, which might and ought to have been utilized by the city in reduction

of damages, and thus that it cannot be said that the consideration has wholly failed.

Were this an action by the engineering company against the city for the contract price, there could be no recovering notwithstanding the fact that the tanks might be in accordance with the contract and of some value, for the reason that the contract is entire, and there has not been complete performance. This rule, however, is not necessarily applicable to this case. We do not understand that money paid to a contractor during the progress of the work can be recovered back merely because the contractor fails to complete the entire work. In order to recover such money back, there must be either an agreement to that effect or an entire failure of the consideration.

The rule is familiar that where personal property is sold under a warranty which is breached, and the property is retained by the vendee, and is of value for any purpose, that value may still be recovered, and if a comparatively small outlay will remedy the defect the vendee's duty is required to make that outlay, and the expense of making such remedy will be the proper measure of the vendee's damages. *J. I. Case P. Works v. Niles & S. Co.* 107 Wis. 9, 82 N. W. 568. The reason of this rule is evidently that the vendee has the right and power to return the article if he chooses, and that his failure to exercise that right constitutes an election by the vendee to appropriate to his own use whatever real value there is in it.

Is this rule or anything analogous to it appropriate in the present case? We think not. In case of permanent erections on real estate like the present, there can be no return of the property, especially where the vendor abandons it, and refuses to have anything more to do with it, on the claim that it fulfills the contract. So the fundamental reason of the rule is lacking. But there are other most persuasive considera-

tions. The city contracted for a complete sewage disposal plant, not for precipitation tanks or for filter beds separately. In order to discharge its duty to its citizens, it must have a complete plant. It made a contract with alleged experts to obtain such a plant, and the plant was to consist of patented devices and operate by patented processes, of which the engineering company claimed that it had exclusive control. It was constructed, but failed to operate. Suppose some part of the machinery was perfect and adapted to the purpose, or was of some value as scrap iron, was the city compelled to spend perhaps large sums of money in endeavoring to obtain other appliances or devise other means to supplement the few perfect parts? While the continual stream of sewage was pouring through its main intercepting sewer at the rate of 600,000 gallons or more a day, demanding disposal, must the city, in order to preserve its rights, enter the unknown field of experiment, and try to patch up a sewage disposal plant, and thereby run the risk not only of complete failure at the end, but also of infringement of patents, and consequent litigation, and of spreading sickness and disease among its citizens? These questions seem to us to admit of but one answer, and that in the negative, and we have no hesitation in so holding. This answer necessarily results in the conclusion that the plant in question was proved to be worthless when it was proven beyond contradiction that it did not dispose of sewage with the results guarantied or approximately those results. The city was entitled to treat it as a complete failure of consideration, notwithstanding some parts performed their work satisfactorily. Nothing could be done with it but to abandon it entirely, as was done. These considerations practically dispose of the case so far as the engineering company is concerned. It is true that a claim was made that the evidence of the various analyses should be stricken out, because it appeared that the effluent was taken at times when sewage was being wasted, and was not all passing through the filter beds.

We find, however, that the samples of effluent were taken from the proper place at times when the plant was in regular operation, and the sewage was passing through in regular course, and thus the samples fairly showed the results reached by the plant.

There are several additional contentions raised on behalf of the surety company which require treatment.

1. It is said that the contract with the engineering company was void because the city charter requires that all work for the city shall be let to the lowest bidder, or, in the absence of competition, that a two-thirds vote of the council shall be necessary to authorize the work, and that it was proven in this case that neither course was adopted. Of the same nature is the objection that the contract was for the use of patented processes and articles, and that the city cannot contract for such use where the charter requires competition, and there is no definite price for the use of the patent for which it is offered to all. *Ricketson v. Milwaukee,* 105 Wis. 591, 81 N. W. 864.

Conceding that the facts are as claimed, there is a very plain misapprehension here of the application of the principles relied on. Taxpayers whose money is about to be spent, or property owners whose land is about to be charged, may challenge the legality of municipal acts and contracts calling for such expenditures on the ground that the proper legal steps have not been taken, but persons who enter into a contract with the city stand in a different position. Such a person cannot even make the defense of *ultra vires* or total lack of power on the part of the corporation to make the contract. *Security Nat. Bank v. St. Croix Power Co.* 117 Wis. 211, 94 N. W. 74. If the defense of *ultra vires* cannot be made, it is very evident that the lesser claim of failure to execute a given power in the statutory way must also be ineffective. By the express terms of the bond the surety company has made the contract a part of the bond. They have con-

tracted with the city, and cannot now be heard to say that the city had no power to enter into the contract or did not make the contract in the required manner.

2. It is said that the surety company was released by the payments of money to the engineering company on the contract under the certificate of but one engineer when the certificate of both engineers was required by the contract. In *Stephens v. Elver,* 101 Wis. 392, 77 N. W. 737, and *Cowdery v. Hahn,* 105 Wis. 455, 81 N. W. 882, it was held that the premature payment to contractors of the contract price of a building will be considered as materially altering the contract so as to release sureties, providing such premature payment be substantial, and not a mere trifling deviation from the contract. The present case, however, is not a case of premature payment in the sense that the money had not been earned, but simply a case where the payment was made without the full certificate required. It has been held that such a payment will not release the surety "when it is manifest that the provision was inserted in the contract for the benefit of the owner alone, and that the payments so made were not greater in amount than they should have been if the certificate had been exacted." *Smith v. Molleson,* 148 N. Y. 241, 42 N. E. 669. These words were cited with approval by this court in *Grafton v. Hinkley,* 111 Wis. 46, 86 N. W. 859. All the elements above required were present in this case, and hence the payments did not materially alter the contract nor affect the rights of the surety.

3. It is contended that the contract was materially altered by the second extension of time granted by the city, because the contract only provides for one extension of time. The contract says that the time for completion "may be extended only by the previous written consent of the mayor and city engineer for good cause shown." This does not say that there can be but one extension either in direct terms or by implica-

tion. Such a construction is not warranted by the words, and is, in our judgment, unreasonably narrow.

4. It appears that the power for the operation of the machinery of the plant was to be furnished by the city. When the contract was made the expectation was that this power should be water power obtained from a dam owned by the city at the head of the Yaharra river, but the contract contains no stipulation to that effect. The only clause of the contract, even distantly referring to the question of power, is the clause that the cost of operating the plant "as the city now proposes to operate its plant shall not exceed" the sum of $3,600. It seems that the city authorities concluded that power could be furnished cheaper by gasoline engines than by utilizing the water power; hence they installed a gasoline engine for the purpose, and thereby produced the required power. There is no claim that it was inefficient or failed in any respect to furnish adequate power. The terms of the contract between the parties were plainly not affected in the least by the change of power.

This disposes of all of the separate contentions of the surety company which we find it necessary to discuss, and relieves us from the consideration of the effect of the indemnity bond which the surety company took from the engineering company.

*By the Court.*—Judgment affirmed.

SIEBECKER, J., took no part.