Eastern Railway Company of Minnesota, Respondent, vs. Tuteur and others, imp., Appellants.

*December 14, 1905—March 20, 1906.*

*Contracts: Effect: Independent contractor or employee? Unilateral contracts: Mutuality: Recitals of bond as affecting contract secured: Appeal and error: Findings of referee, when disturbed: Principal and surety: Prejudicial variation: Payments: Release of surety: Strikes: Referees to hear, try, and determine: Powers: Right to review orders of court: Discovery: Adverse witnesses: Refusal to testify: Striking out complaint: Discretion: Damages on partial performance.*

1. In an action on a freight-handling contract between a railway company and P., set out in the opinion, P. is *held* to be an independent contractor and not a mere employee of the railway company.

Eastern R. Co. of Minn. v. Tuteur, 127 Wis. 382.

2. An executory contract in which the promises are all on one side is unilateral and not to be enforced.

3. A freight-handling contract between a railway company, with an established business and dock at a junction point between its line and water navigation, and P., which did not in express words require the railway company to furnish P. any freight to handle, under the situation and circumstances surrounding the parties when the contract was made and the words of the contract, stated in the opinion, is *held* to require the railway company to furnish to P. freight to handle, sufficiently fixed in amount as to render the contract mutual, definite, and certain.

4. In such case P. had given a bond to secure the performance of such contract, which, in referring to the contract, recited that P. had thereby contracted to handle the freight which the railway company "requests him to handle." It appeared from the evidence, however, that there were carriers who brought merchandise to the railway company's dock, and who had the right to handle their own freight, if they so chose. *Held*, that it did not follow from the quoted words that the railway company was not bound to give P. any freight to handle, since it would be necessary for the railway company at times to designate to P. the freight which he was to handle and the freight which was to be handled by the carriers themselves, and that such language referred to such contingency.

5. In an action for damages for the breach of a contract, a finding by the referee before whom the action was tried that certain transactions were an abandonment of the contract and not a partial and mutual settlement between the parties, being supported by ample evidence, will not be disturbed.

6. In an action on a bond securing the performance of a freight-handling contract, under the evidence, stated in the opinion, a finding that contracts for certain work, alleged to be such a modification of the contract as to release the sureties on the bond, were for work outside of the freight-handling contract, will not be disturbed.

7. A contract between a railway company and P., secured by P.'s bond, provided for semi-monthly payments, the moneys earned between the 1st and the 15th of the month to be paid on or about the 20th day of the month, and those earned during the remainder of the month to be paid on or about the 5th of the following month. Under such contract payment was made on the 15th for what had been earned during the preceding half of the month, and on the 16th for what had been earned on the 15th, such payments being made after the railway company knew that P. had violated his contract and when it was doubt-

ful whether he could complete it. *Held*, that such payments were not such a deviation from or violation of the contract that P.'s sureties were thereby discharged.

8. Such provision giving the railway company five days' time in which to make payments was not a provision for the benefit of the sureties, but simply for the convenience of the railway company in auditing.·

9. Where money has been earned, the making of payment in advance of the day when it could be legally demanded or sued for is not, as to a surety, a prejudicial variation of the contract, but merely a waiving of a privilege.

10. A contract contained a condition to protect plaintiff from loss by reason of strikes. There was no such condition inserted in the bond securing the performance of such contract, nor any separate bond given, and a claim was made that thereby plaintiff waived the giving of indemnity against loss by strikes. *Held*, that such claim was immaterial where the judgment in favor of plaintiff did not include any sum for damages on that ground.

11. Where a cause was referred to a referee to hear, try, and determine the issues raised by the pleadings, the referee cannot review an order made by the circuit court refusing to dismiss the complaint because of the refusal of plaintiff's attorney to testify as an adverse witness.

12. The power of the court, under sec. 4097, Stats. 1898, to strike out the pleading of an adverse party who refuses to testify under the requirements of sec. 4096 and give judgment as upon default or failure of proof, is discretionary, and will not be reversed except for abuse.

13. On trial of an action to recover for breach of a freight-handling contract between a railway company and P., the referee assessed against the sureties on P.'s bond simply the increased cost of doing the work during the balance of the contract period over and above what it would have cost under the P. contract, deducting payments made to P. and the amount paid for Sunday labor. The referee found that the railway company exercised due care in carrying on the work and paid only the reasonable and necessary cost thereof. *Held*, that the referee applied the right rule in assessing the damages.

Appeal from a judgment of the circuit court for Douglas county: A. J. Vinje, Circuit Judge. *Affirmed*.

The plaintiff is a railroad corporation operating a railroad line from St. Paul, Minnesota, to the city of Superior, and

owning and operating docks and warehouses in the city of Superior for the discharge and storage of freight, as well as the transfer of through freight from its cars to lake carriers, and *vice versa*. On April 20, 1899, it entered into a written contract with the defendant Promberger, by which Promberger agreed to take charge of and operate its docks and warehouses at Superior and handle all freight passing through the same during the navigation season of 1899 for certain rates figured upon a tonnage basis, to be paid him by the plaintiff. On the same date the defendant Promberger as principal, and the remaining defendants and appellants as sureties, gave to the plaintiff a bond in the penal sum of $16,000 to insure the faithful performance of said contract by Promberger. This action is brought upon the bond to recover damages for the alleged breach by Promberger of the freight-handling contract on August 16, 1899. The appellant *Tuteur* and his co-sureties answered, alleging, among other things, by way of defense that the contract in question was not a real but only a simulated contract, and that in fact Promberger was but an employee of the plaintiff; that it was unilateral and contained no consideration or correlative promises on the part of the plaintiff; that it was indefinite and uncertain and not capable of enforcement; that it was released and surrendered by mutual consent August 16, 1899; that, if there was any breach thereof, such breach was the result of a strike of freight handlers, and that the bond did not cover such a breach; that the sureties had been released by a modification of the contract made without their consent and by the making of premature payments thereon to Promberger; that defendants were not liable because Promberger was, to the knowledge of plaintiff's officers, an embezzler before the making of the contract, which fact was concealed by said officers from the appellant; that there could be no recovery, for other reasons not necessary to be now stated.

The action was referred to L. K. Luse, Esq., to hear, try,

and determine.   Upon the trial there was no dispute as to the formal execution and delivery of the contract and bond referred to in the complaint.   The contract was very lengthy, and the first three paragraphs thereof were as follows:

"(1) This agreement, made and entered into this 20th day of April, A. D. 1899, by and between John Promberger, of the city of Superior, county of Douglas, and state of Wisconsin, party of the first part, and the *Eastern Railway Company of Minnesota,* a corporation organized and existing under the laws of the state of Minnesota, party of the second part, witnesseth:

"(2) That, whereas, the party of the second part owns, controls, and operates docks and warehouses and rail and lake terminals at Superior, Wisconsin, in connection with its line of railroad and the business appertaining thereto; the said docks and warehouses are those usually constructed and operated for the purpose of receiving, forwarding, transferring merchandise, freight, or other property handled by the party of the second part in its business as a common carrier:

"(3) Now, therefore, in consideration of the covenants and agreements hereinafter contained, to be performed by the party of the second part, the said party of the first part agrees to assume charge of and operate the said docks of the party of the second part, under the direction of the party of the second part, or its representatives, in such manner as may best subserve the interests of the party of the second part; and the party of the first part hereby agrees to load or unload *all* cars or vessels and to properly stow *all* the freight, goods, and merchandise arriving at or forwarded from said docks or warehouses of the party of the second part, which the party of the second part may have charge of as common carrier, or own, or in its business of transporting, warehousing, or handling merchandise at the docks or warehouses of the said party of the second part, situated as above described; and the party of the first part agrees to continue such service during the navigation season of 1899, as the said party of the second part, its agents or representatives may direct."

Following these clauses came a number of subsidiary agreements on the part of Promberger, to the effect that the freight was to be loaded or unloaded from cars or vessels into ware-

houses or upon docks, as the plaintiff's agents should direct; that Promberger should furnish all necessary men for the work as the plaintiff should direct from time to time; that Promberger should employ competent and reliable persons to supervise the work under the direction of the plaintiff as to the manner of handling freight; that he would not employ persons objectionable to the plaintiff, and would dismiss any such person upon the plaintiff's request; that he would divide his employees into such gangs as might be necessary to best handle the business or as directed by the plaintiff's agents; that he would handle all gang planks, skids, hoisting machinery, and other appurtenances necessary; that he would perform all labor connected with the operating of the dock, the same as if it was operated by direct employees of the plaintiff, and take care of the docks, warehouses, and other properties, and keep them in good condition; that his men should commence work at 7 o'clock in the morning, and report for duty at any time thereafter as might be necessary for the proper handling of the business and as directed by the plaintiff's agents, it being understood that a regular day gang and a regular night gang should be maintained; that the plaintiff should have the right to employ one or more check clerks or foremen to supervise the handling of freight; that the plaintiff should also have the right to select from Promberger's employees ten or more men for the special work of calling freight and stowing freight; that Promberger should give a good bond in the sum of $16,000, with sureties, conditioned for the faithful performance of the agreement and to protect the plaintiff against any loss from detention of said freight by reason of strikes and from any damage or loss to property by theft, or otherwise, while the same was being handled, and with further conditions not necessary to be stated; that the expenses or liability for damage or loss to freight while being handled should be determined by persons employed by the plaintiff; that in computing tonnage of

freight handled the weights shown by the boat manifests, rail-
road receipts, or railroad billing should govern; that flour
and barrels should be handled on the basis of 200 pounds per
barrel, and other freight usually transported by package upon
the basis of such weights as were prescribed by the rules of
the Chicago board of trade; that in the handling of freight
in sacks or frail packages the load to be hoisted out of the
hold or into the hold of a vessel should not be such as to dam-
age the package, nor greater than as directed by the plaintiff's
agent. The contract further provided that in consideration
of the full and faithful performance of the above-mentioned
agreements on the part of Promberger the plaintiff agreed to
pay Promberger, on or about the 5th and 20th days of each
month during the season of navigation (unless the contract
should be sooner annulled), certain fixed rates per ton for the
freight handled, according to the character of the freight and
the necessary handling to be done, which rates it is unneces-
sary to state in detail; that it would employ a competent and
reliable agent to supervise the business, Promberger agree-
ing to conform to the rules and regulations laid down by said
agent; that it would furnish all necessary tow boards, planks,
and other appurtenances for the proper handling of the
freight; that all employees should have one hour for dinner,
one hour for supper, and one hour for midnight lunch; that
payments upon the contract were to be based on the freight
tonnage handled during the period from the 1st to the 15th,
and from the 15th to the last day of each month during the
continuance of the contract; that it would furnish all neces-
sary switching service and do all the necessary switching of
cars; that it would employ one or more trustworthy watchmen
whenever Promberger or his representatives were not pres-
ent. It was further mutually agreed that, in the event of
damage to freight being handled, the same should at once be
turned over to the plaintiff to be disposed of and to make set-
tlement with the owner; that, in the event that Promberger

should conduct the business during the season of 1899 in a competent and satisfactory manner, he might, if he chose, "have a contract for the handling of said second party's freight for the year following the termination of this contract, such contract to be substantially in terms the same as this contract;" that as a further consideration to Promberger plaintiff should rent to him a boarding house located near the docks at a nominal rent of $5 for the season, Promberger agreeing to maintain the same in an orderly and respectable manner and to deliver the same over to the plaintiff in good condition at the end of the season; that it was understood between the parties that Promberger should be, in the performance of all his duties, an independent contractor, and subject to the legal duties and liabilities applicable to such contractors. The bond accompanying this agreement, and upon which this action was brought, is in the usual terms of an indemnity bond, in the penal sum of $16,000, is signed by the appellants, and, after the formal parts, reads as follows:

"The condition of this obligation is such that, whereas the above named John Promberger has this day entered into an agreement in writing with the said *Eastern Railway Company of Minnesota,* which said agreement is hereunto annexed, by the terms of which the said John Promberger has contracted to operate the docks and warehouses of the said *Eastern Railway Company of Minnesota,* and to handle, transfer, and stow all freight and merchandise which the said *Eastern Railway Company of Minnesota* requests him to handle, transfer, and stow at the docks of the said *Eastern Railway Company of Minnesota* on cars or upon vessels, in changing business with the said railroad company, in the city of Superior, during the season of navigation of 1899.

"And whereas the said John Promberger has entered into certain covenants and agreements in relation to handling, transferring, and storing said freight and merchandise contained in the said written contract:

"Now, therefore, in case the said John Promberger shall duly and faithfully perform all the covenants and agreements contained in the said agreement on his part to be performed,

and shall save harmless the said *Eastern Railway Company of Minnesota* for all loss or damage by reason of any failure on his part to so perform the covenants and agreements on his part, then this obligation shall be null and void and of no effect, otherwise in full force and operation.

"In witness whereof we have hereunto set our hands and seal the day and year above written.

| | | Amount. |
|---|---|---|
| "J. Promberger. | [Seal.] | |
| "Harrie Rogers. | [Seal.] | Amt. $4,000 |
| "Frank H. Ruger. | [Seal.] | Amt. $4,000 |
| "Ogden H. Hammond. | [Seal.] | Amt. $4,000 |
| "H. W. Dietrich. | [Seal.] | Amt. $500 |
| "Myron Reed. | [Seal.] | Amt. $500 |
| "Joseph Tuteur. | [Seal.] | Amt. $1,500 |
| "John E. Greeley. | [Seal.] | Amt. $1,500" |

The action was tried before the referee and a great volume of evidence introduced, and the referee made the following findings of fact:

"(1) That prior to the execution of the contract between the plaintiff and the defendant John Promberger, on or about April 20, 1899, the plaintiff was the owner of a large terminal warehouse located on the bay front and occupied and used as a terminal facility for its railroad and as a connection between said railroad and the boat lines operating upon the Great Lakes. That it also occupied as lessee an open dock known as the P. & R. dock, where it had been accustomed to receive, for transportation over its lines, steel rails, and that these two docks were the only lake and rail terminal facilities owned or operated by the plaintiff previous to the time of the making of said contract on April 20, 1899, and this was well known to the defendant John Promberger at the time of entering into the contract referred to.

"(2) That the contract dated April 20, 1899, and marked plaintiff's Exhibit 96, was duly executed and delivered by the parties thereto in good faith and for the purposes therein expressed.

"(3) That the bond upon which this suit is brought to recover, and known as plaintiff's Exhibit 95, was duly executed by all of the defendants and delivered to the plaintiff, and so delivered and received in good faith and with intent that it

should become a valid and binding instrument upon all the defendants.

"(4) That the defendant Promberger had operated the docks already mentioned for the navigation season of 1898 under a contract somewhat similar to that of April 20, 1899. That it was well known by him and the plaintiff's officers that the plaintiff's business as a common carrier required it to receive, transport, and unload at the terminal docks mentioned a large amount of freight eastbound. That as the owner and operator of said docks and warehouse it would, in the usual course of business, receive large amounts of freight, including steel rails, from shippers or boat lines operated upon the lakes, and that as a part of plaintiff's business in operating said docks it would naturally, and in the usual course of business, unload from boats the larger part of said freight as a convenient method of operating the docks at the connecting point between its railroad and boat lines. That it was also well known that shippers or boat lines who might insist upon or desire to unload their own freight or cargoes would have the privilege of doing so, and that thereby the amount of freight to be handled under the contract might be somewhat lessened or decreased by the exercise of such privilege or right, and that the parties to the said contract contemplated at the time of entering into said contract that it only covered such freight as the plaintiff, in its business as a common carrier or in the operation of said docks, was called upon to handle, and this without reference to whether it was legally bound to handle the same either by contract or otherwise.

"(5) That the defendant Promberger entered upon the performance of said contract on or about the 20th day of April, 1899, fully performed the same down to the 13th day of August, 1899, and that the plaintiff fully performed said contract upon its part until said contract was abandoned by the defendant Promberger on the afternoon of August 16, 1899.

"(6) That on the 13th day of August, 1899; the employees of the defendant Promberger demanded an increase of wages amounting to about twenty-five per cent., and some of them quit work on that day. That on the 14th day of August, the demand for higher wages not being complied with, others of said employees quit work, and from that time on until the

afternoon of the 16th of August there was almost a complete cessation of work upon the docks. There was plenty of work to do, and during the 13th, 14th, and 15th frequent demands were made upon the defendant Promberger to handle the freight in accordance with his contract, which he failed to comply with and thereby violated his contract both in spirit and in terms. That these several violations of his contract on the 13th, 14th, and 15th of August, 1899, were well known to the plaintiff's local agent in charge of said docks and were also known to plaintiff's division superintendent, George T. Slade, as early as noon of the 14th of August, and that said Slade's office was then in the city of Superior, where said docks are located, and that on the 15th day of August, about noon, said Slade called upon some of the sureties to assist Mr. Promberger in the carrying out of his contract.

"(7) That the cessation of work upon the docks continued until the afternoon of the 16th day of August, at which time a conference was had between the plaintiff's officers; Mr. Hill, the vice-president, Mr. Slade, the superintendent, Mr. Dooley, the local agent, and Mr. Murphy, the attorney, and the defendant Promberger and *Mr. Ruger,* one of the sureties, being also present. That at this conference the defendant Promberger notified the plaintiff of his inability to continue the performance of the contract, and said defendant did then and there wholly abandon said contract. . That there was no settlement between the plaintiff and Promberger, and no acceptance of any surrender of the contract, or any release of said Promberger from his obligations under said contract, nor any release of the sureties upon the bond given to secure the performance thereof. That what took place at said conference was contemplated by the plaintiff, and was in fact simply a precautionary measure to determine its right to proceed with the operation of its docks independent of the defendant Promberger, and that no question would be raised as to the plaintiff's right to do so.

"(8) That the plaintiff proceeded at once after the conference of August 16th to organize the force to operate the docks, and doing so acceded at once to the demands of the employees of the defendant Promberger for an advance of wages, which amounted to about twenty-five per cent., and continued to operate the docks by employing the laborers and superin-

tending the work on its own account and without letting out the work to contractors, excepting the loading of the rails on the P. & R. dock, which was let out upon contract to Mudge & Thorgerson, thus carrying on the work until the close of navigation on December 18, 1899.

"(9) That the total cost to the plaintiff in the operation of the docks and in doing the work which the defendant Promberger was required to do under his contract, after his abandonment thereof on the 16th day of August, 1899, until the close of navigation on December 18, 1899, was $58,469.11. That of this sum the plaintiff paid the employees' wages in doing the work at the flour sheds the sum of $56,062.95, paid to laborers engaged on the P. & R. dock $1,264.20, paid to Mudge & Thorgerson, the contractors, $776.96, paid for tools, equipments, etc., $365, making a total of $58,469.11. That some of the labor in carrying out this contract was performed on Sunday, and the wages paid therefor amounted in all to $5,324.74 and the extra cost of such labor was $151.51; the Sunday labor being paid for as overwork to the regular men and the wages increased five cents an hour, which last-named sum I find is not properly chargeable to the defendants, and hence deduct it from the previous cost of operating the docks, leaving the amount of the cost of the operation of the docks $58,317.60. I further find the cost of doing the work under the contract with the defendant Promberger would have amounted to $42,191.07, and that the plaintiff sustained damages by the increased cost of doing the work over and above what it would have cost under the Promberger contract in the sum of $16,126.53.

"(10) That the plaintiff has paid the defendant Promberger for all work done under the contract by him, except the sum of $957.20, which it still holds and claims the right to withhold on account of the damages suffered by it, and that the plaintiff has suffered damages over and above the $957.20 in the sum of $15,169.33.

"(11) That the plaintiff on August 15, 1899, and in the early part of said day, computed and certified the earnings of the defendant Promberger under his contract for the first half of the month of August in the sum of $5,519.42, and thereafter, and about noon of August 15th, by draft issued out of the office of its superintendent, paid said money to said

Promberger, and afterwards, and on August 16th, paid to said Promberger the further sum of $401.90, being a further amount earned under said contract. That at the time of paying the two amounts above mentioned the plaintiff's officers, particularly its local agent, J. P. Dooley, who certified the work, and George T. Slade, its superintendent, knew that the defendant Promberger had repeatedly violated the contract. That the work upon the docks had practically ceased. That the wages demanded by the men were such that it was at least very doubtful whether the defendant Promberger would or could proceed with and complete his contract. That the evidence does not disclose whether the payment of the $5,519.42 on the 15th day of August was prior or subsequent to Mr. Slade calling upon the sureties to aid Mr. Promberger, but I find that the plaintiff was fairly chargeable with notice that Promberger would very likely be unable to perform his contract, and that damages might result to the plaintiff thereby, before the payment of the $5,519.42 on the 15th day of August, 1899.

"(12) That the plaintiff has not since paid the $957.20, being the sum of two bills certified as earned by the defendant Promberger, the sum of $790.80 being certified by audit voucher No. 1655, being defendants' Exhibit C1; and the sum of $166.40, shown by canceled treasury voucher, defendants' Exhibit F1. It did, however, pay to the defendant, on or about August 16, 1899, the sum of $543.55, being the amount shown in treasury voucher No. 346 and draft No. 15, mentioned in the deposition of George T. Slade. That the money so paid was advanced by the plaintiff to said Promberger to pay him for the handling of certain steel rails consigned by steel companies to the Great Northern Railway Company, and was in fact an advancement by the plaintiff for such work on account of the consignor, and would only be repaid to the plaintiff by reason of such advancements, and for this reason the defendants and none of them are injured by such payment, and except as above the plaintiff paid the defendant Promberger no money after August 16, 1899.

"(13) That the plaintiff did not alter or modify its contract with the defendant Promberger, or consent to any modification thereof, and whatever arrangement was made between Mr. Promberger and other parties, particularly the

Davidson Steamship Company to unload the steel rails, was work outside of the Promberger contract, or at least such as he could not require the plaintiff to furnish him.

"(14) That the evidence does not show that the plaintiff participated in the efforts made on the part of A. L. Williams, and some other of its employees, by way of taking assignments of the claims of some of Promberger's former employees of their claim against him, and by garnishment suits endeavoring to obtain a preference over the defendant sureties as to money deposited in the Northwestern National Bank, or as to any money owing by the plaintiff to the defendant Promberger.

"(15) That the plaintiff exercised ordinary and reasonable care taking up and carrying on the work after the abandonment of the contract by the defendant Promberger, and that the amount paid therefor as stated in a previous finding was the reasonable and necessary cost of such work, after deducting the $151.51 which was paid extra by reason of a portion of the work being performed on Sunday.

"(16) That in addition to the damages sustained by the plaintiff by way of the increased cost of doing the work, over and above what it would have cost under the contract, plaintiff sustained some damage by way of detention of its cars for the reason that they were not speedily unloaded, as required by the contract. This damage was in part occasioned by the violation of the contract by the defendant Promberger between August 13, 1899, and the abandonment of his contract on the afternoon of August 16, 1899, and for which counsel for the plaintiff disclaimed upon the trial to recover, and a part because the plaintiff was unable to procure a sufficient number of men at the time it took up the work on August 16th, and also because of a congested condition of the yards. That the amount of damage so suffered was sought to be proven on the trial by showing the number of days for which cars laid idle over and above the usual time for unloading and the earning capacity of the cars for the time they were so detained, and the plaintiff's evidence tends to show that cars were so detained, equal to a single car being held 1,095 days, and that the net earning capacity per car per day was from $5 to $7. I am unable from the evidence to find that the plaintiff sustained the amount of damage thus claimed.

Whether the plaintiff lost the freight it would otherwise have carried, or whether those cars were moved more rapidly as soon as the detention ceased, or whether the plaintiff transported the freight at a little later time, is altogether too problematical. I do find, however, that the cars were detained as claimed to the extent of 1,005 days for a single car, and that a fair rental value per car per day was $3.

"(17) That the plaintiff's officers, prior to the execution and delivery of the bond here sued upon, had information that the defendant Promberger had had some financial troubles, but were not informed that he was guilty, or had been convicted of any criminal charge. That they had a right to believe, and did believe, that he was a capable contractor, and one who was able to perform the contract in question, and they did not notify the other defendants of such information as they had in regard to Mr. Promberger.

*"Conclusions of Law.*

"As conclusions of law I find and hold:

"(1) That the contract between the plaintiff and the defendant John Promberger was and is a valid, binding contract. That it is not lacking in mutuality, but was intended to apply, and did apply, to all freight which the plaintiff had charge of as a common carrier, or to which it had title, or which came to it to be handled by it in its business as a warehouseman or in the operation of the docks. That the amount of freight to which the contract applied might have varied more or less, depending upon whether the shippers or boat lines insisted upon loading or unloading their own freight, and this may have been to some degree discretionary with the plaintiff; but I hold that it had the right to exercise such discretion. That it was bound to furnish the defendant, under the contract, with the work and pay him therefor, all freight which it had in charge as a common carrier, all of which it owned, and all which came into its hands for handling in its business as operating the warehouse and docks, but this did not necessarily include all freight unloaded upon said docks. I find that there was a consideration for the making of the contract, and that the fact that the amount of freight might vary, even though in the discretion of the plaintiff, did not invalidate or render the contract not binding. I further hold

that the contract, being under seal, imports a consideration,. and that the contract would be binding, even though it was discretionary with the plaintiff as to all of the freight how much the defendant Promberger should handle.

"(2) That the bond executed by the defendants on or about April 20, 1899, is a valid and binding instrument. That the defendant Promberger was bound under the contract for all damages which the plaintiff might sustain by reason of any breach on his part, and that the omission to state the amount for which he was bound opposite his signature is of no consequence.

"(3) That the failure of the plaintiff to give notice to the defendant sureties of the information received by its officers as to the defendant Promberger's financial trouble in no way affected the validity of the bond.

"(4) That the payments to the defendant Promberger by the plaintiff on the 15th and 16th days of August, 1899, did not discharge the sureties from liability. That the $5,519.42 on the 15th was made before the full expiration of the time when it was absolutely due and payable, but not before it was earned, and not in violation of any of the terms of the contract. It was only premature in the sense of being paid five days before the plaintiff was obliged to pay it, and being by the terms of the contract payable on or about the 20th, I hold it was not in violation of the terms of the contract to pay this money at the time it was paid.

"(5) The plaintiff did not violate the contract nor were the defendant sureties discharged by the payment to the defendant Promberger by the plaintiff of a draft of $543.55 on August 18th, as this payment was an advancement of money due from other parties.

"(6) That the fact that a part of the work after August 17th was performed by the plaintiff on Sunday does not affect its right to recover damages for breach of contract, except so far as the cost of the work was increased thereby in the sum of $151.51.

"(7) That the payment of $5,519.42 on August 15th and the further payment of $401.90 on August 16th, by the plaintiff to the defendant Promberger after he had repeatedly broken his contract, and such breaches continuing until the final abandonment on the afternoon of August 16th, was un-

warranted and in derogation of the rights of the defendants, other than John Promberger, and that they are entitled to credit of those amounts upon the damages suffered by the plaintiff the same as if such payments had not been made.

"(8) That the defendants, other than John Promberger, are entitled to credit upon the damages suffered by the plaintiff the sum earned by the defendant Promberger under the contract which he has not been paid, being $957.20.

"(9) That the damages suffered by the plaintiff by way of detention of its cars are too remote to be recovered in this action. That the contract in question, in paragraph 14, required the defendant Promberger to give a bond which would, among other things, protect the plaintiff 'against any loss from detention of such freight by reason of strikes and from any damage or loss to property by theft or otherwise.' The bond does not contain this provision, but is general for the performance of the contract by Mr. Promberger. In my opinion the clause quoted was intended to indemnify the plaintiff against loss suffered from the detention of perishable and perhaps other freight and from theft, where claims were made by shippers, and that it had no reference to the detention of cars. I do not think it would be fairly within the contemplation of the parties at the time of the execution of the contract that the plaintiff would be unable to, at some price, obtain help and expeditiously unload its cars in case of the default of Mr. Promberger, and that there is no reason in this case for departing from the general rule that the damages suffered are the difference between the contract price and the actual and reasonable cost of doing the work.

"(10) That the plaintiff is entitled to judgment against the defendant John Promberger in the sum of $16,126.53, with interest at six per cent. from December 18, 1899.

"(11) That the plaintiff is entitled to judgment against the defendants, other than John Promberger, in the aggregate sum of $9,248, with interest from December 18, 1899, to the present time, amounting to $1,853, a total of $11,101, and that judgment be entered in form against the defendant *Harrie Rogers* in the sum of $4,000; the defendant *Frank H. Ruger* in the sum of $4,000; the defendant *Ogden H. Hammond* in the sum of $4,000; the defendant *H. W. Dietrich* in the sum of $500; the defendant *Myron Reed* in the sum of

$500; the defendant *Joseph Tuteur* in the sum of $1,500; and the defendant *John E. Greeley* in the sum of $1,500; but providing therein that all of said judgments shall be satisfied upon the payment or collection thereon of the sum of $11,101, being the aggregate amount due the plaintiff, with interest thereon from the date of said judgment, and that the plaintiff is entitled to judgment against all the defendants for its costs and disbursements in this action."

Many exceptions to the findings of fact were preserved, and the appellants requested counter findings, and also moved the court to set aside the report and re-refer the action, and the plaintiff moved to modify the report and to confirm as modified. These motions were heard at the same time, and the court in all things ratified and confirmed the report and denied all other motions, and ordered judgment against the defendant Promberger for $16,126.53, with interest, and against the appellants severally for the amounts respectively set opposite their signatures to the bond, with costs; and further ordered that all of said judgments, except the judgment for costs, should be satisfied upon payment of the total sum of $11,101, with interest from April 23, 1903, and rendered judgment in accordance with said order. Afterwards, upon motion, the court modified this judgment by providing that the plaintiff should also recover against each of the appellant sureties his proportionate share of the interest on $11,101 from April 23, 1903, to January 10, 1905, and that the judgment against each of the appellants might be satisfied upon payment by him of the amount of the judgment against him, including such proportionate share of the interest, with interest from the date of the judgment and costs; and further providing that all of the judgments against the appellants should be satisfied and discharged when the appellants or any number of them should have paid a sum equal to the sum of $11,101, with interest as aforesaid and costs. From this judgment the sureties upon the bond appeal.

For the appellants there was a brief by *A. B. Ross, John*

*Brennan*, and *William Ruger*, attorneys, and a reply brief signed also by *William Ruger*, of counsel, and oral argument by *Mr. Brennan* and *Mr. Ruger*.

For the respondent there were briefs by *J. A. Murphy*, *W. M. Steele*, and *Heber McHugh*, and oral argument by *Mr. Murphy* and *Mr. Steele*.

The following opinion was filed January 9, 1906:

WINSLOW, J.    While the contention was made by the appellants that the freight-handling contract in question was merely simulated, or, if not simulated, that its legal effect was to make Promberger merely an employee of the plaintiff, and not an independent contractor, we regard these contentions as being so manifestly untenable that we are not required to discuss them at length, and will simply content ourselves with stating that they are overruled.

The leading questions in the case are whether the contract created the required mutuality of obligation—*i. e.* did it require the plaintiff to furnish Promberger any freight to handle—and whether it was sufficently definite and certain so that damages can be recovered for its breach.    An executory contract in which the promises are all on one side is unilateral and not to be enforced.    This is familiar law, and if in the present case, by the true construction of the written agreement, Promberger promised to handle freight, but the plaintiff did not either expressly or by implication agree to furnish him any freight to handle, doubtless the agreement would be unilateral.    So far as it remained executory it would be an unaccepted offer.    So also, if the amount of freight to be handled was neither fixed with reasonable certainty nor ascertainable, there would be no way of measuring the damages suffered with legal certainty, and no court would be required to attempt the task.    These principles are quite elementary and do not require elucidation.    The question is whether the contract is subject to either of these ob-

jections. The contract certainly does not in express words require the plaintiff to furnish Promberger any freight to handle. Does it do so by necessary implication? In answering this question attention must be paid to the situation and circumstances surrounding the parties when the contract was made. The plaintiff was a railroad corporation operating a railroad between St. Paul and Minneapolis on the one side, and the city of Superior and the Great Lakes on the other. It was, of course, a common carrier transporting large quantities of coal, lumber, flour, and merchandise of all kinds between its termini. It was also a part of the Great Northern Railway system, which system covers a great extent of territory and has its western terminus on the Pacific coast and its eastern terminus at Superior. This system does an extensive business transporting through freight from west to east and from east to west, the same being transferred from cars to lake carriers and from lake carriers to cars at Superior by means of the warehouses and docks of the plaintiff. This transfer business was of great volume, necessitating the employment of from 100 to 350 men, and hence it was essential that the work be systematized and managed with the greatest care and ability, if the railway system was to successfully perform its duties as common carrier. The contract shows that the railroad company, while desiring to retain a sufficient control of the manner of handling and transferring freight at its terminals to insure both care and rapidity in the handling, also desired to place the business in the hands of an independent contractor who would agree to handle the freight at certain definite prices during the entire navigation season. That such an arrangement made with a responsible person was a desirable arrangement is very obvious. It appears that such a contract had been made with Promberger for the handling of freight during the season of 1898 and that it had been satisfactorily performed, and that

for this reason the plaintiff was willing and desirous of making a like arrangement for the season of 1899.

Thus we see that the purpose of the contract was to secure the proper and speedy execution of an absolutely vital part of a very large and well established business, which, if delayed or inefficiently performed even for a day, necessarily involved great loss and damage. Bearing these conditions in mind, and proceeding to examine the words of the contract, we find that the first promise on the part of Promberger is that he will *assume charge of and operate* the plaintiff's docks during the navigation season of 1899, and will load and unload *all cars or vessels* and properly stow *all freight, goods, or merchandise* arriving at or forwarded from said docks or warehouses which the plaintiff may own or have charge of as common carrier in its business of transporting, warehousing, or handling merchandise at said docks or warehouses, under the direction of and as may best subserve the interests of the plaintiff, in consideration of the agreements and covenants on the part of the plaintiff afterwards contained in the contract. After this general promise follow a number of subsidiary promises by Promberger as to the details of the work and the manner of its performance, a number of which provide that such details shall be performed "as directed by the plaintiff or its agents;" also a provision that Promberger shall give a bond to secure the performance of the contract, and then comes the plaintiff's promise that in consideration of the faithful performance of Promberger's aforesaid agreements it will pay him certain fixed rates per ton for freight handled by him which is transferred from cars to vessels or from vessels to cars, and other certain rates per ton for freight simply received and stowed, payments to be made twice a month; and will also furnish Promberger certain necessary conveniences, do necessary switching, furnish a boarding house at a nominal rental and grant to him certain other privileges, and finally that, in case Promberger carries out

his contract satisfactorily, he shall have the right to demand a contract for the handling of the plaintiff's freight for the following year on the same terms.

Rejecting the provisions which relate merely to details, and stripping the contract down to its essence, it consists of a promise by Promberger to do all the freight handling at the plaintiff's warehouses and docks incidental to plaintiff's business at agreed rates, and a correlative promise by the plaintiff to pay those rates for the work at certain intervals. It is true that it is not said in so many words that the plaintiff agrees that it will furnish all its freight to Promberger to handle; but is not that promise a necessary implication? Suppose a merchant makes a written contract with an expressman by which the expressman agrees to do all the cartage of merchandise and parcels incident to the merchant's business for a year at certain specified rates, which rates the merchant agrees to pay; could it be claimed for a moment that the merchant could refuse to allow the expressman to carry any freight, but could treat the contract as a mere offer and employ another to do the work or any part of it without breach of his contract? Would this be an allowable construction of such a contract? We cannot think so. Contracts must be reasonably construed. Conditions or agreements cannot be imported into them, but conditions or agreements necessarily implied are already there. If a man agrees with me to take care of my furnace for a year for a certain sum of money per month, and in consideration thereof I agree to pay him such sum per month, it certainly is not necessary, in order to bind myself, that a clause be added to the effect that I agree to *allow* him to take care of the furnace. Yet such would be the logical result of the appellants' contention. The appellants rely on such cases as *Wells v. M. & St. P. R. Co.* 30 Wis. 605; *Beers v. North Mil. T. S. Co.* 93 Wis. 569, 67 N. W. 936; *Teipel v. Meyer,* 106 Wis. 41, 81 N. W. 982, and *Hoffman v. Maffioli,* 104 Wis. 630,

80 N. W. 1032, as sustaining their position in this case, but examination of those cases shows clearly that they differ essentially from the case at bar, and can hardly be considered as even analogous. In each of them, by the express terms of the contract as construed by the court, only such work was to be done or articles furnished as the other party might desire. In none of them were the amounts fixed by the wants of an established business, but it was left optional with the defendant whether any work should be done or any materials delivered. No such right is reserved either expressly or impliedly by the terms of the contract before us, but, as we have seen, there is a clear implication to the contrary. If anything were needed to demonstrate more clearly the intention of the parties that the contract was to cover all the freight handling incident to the plaintiff's business it would be furnished by that clause of the contract which gives to Promberger the right to demand a renewal of the contract for the next year. That clause guarantees to Promberger in a certain contingency the right to demand another contract for the handling of *said second party's freight* for the year following, to be in substantially the same terms as this contract. The right thus guaranteed to Promberger is not the right to make the same offer or to make a unilateral agreement, but the right to have a contract for the handling of the plaintiff's freight. This provision seems to us to recognize very plainly that the parties deemed the present contract to be a contract giving Promberger the right to handle the plaintiff's freight during the season of 1899. This is apparently a written construction by the parties of the contract; but, further than this, the evidence shows that from the time of the execution of the contract up to the middle of August, when the breach occurred, all the freight handling incident to the plaintiff's business was in fact done by Promberger, and thus the parties by their acts construed the contract in the same way.

Some stress is laid by the appellants upon the fact that the

preamble of the bond on which the action is brought, in referring to the agreement, recites that Promberger had thereby contracted to handle the freight which the plaintiff "requests him to handle," and it is argued that this recital plainly shows that the plaintiff was not bound to give Promberger any freight to handle. While this language is nowhere found in the agreement itself, its presence in the bond doubtless tends in some degree to support appellants' theory. It appears, however, that there were some lake carriers who brought merchandise to the plaintiff's dock who had the right to handle their own freight, if they so chose. Hence it would be necessary for the plaintiff at times to designate to Promberger the freight which he was to handle and the freight which was to be handled by the carriers themselves, and we think that this is the contingency to which the language refers.

Having reached the conclusion that the contract is mutual in its obligations and not unilateral, we shall next consider the question whether it is reasonably definite and certain as to the work to be done. We think this question is very definitely answered in the affirmative by the principles laid down in the case of *McCall Co. v. Icks,* 107 Wis. 232, 83 N. W. 300, and *Excelsior W. Co. v. Messinger,* 116 Wis. 549, 93 N. W. 459. In the latter of these cases this principle is laid down in the opinion by Mr. Justice DODGE:

"In later times courts have fully recognized that when the discretion, wants, or needs of a party are referred to an existing situation, such as an established business or a known enterprise, and intended to be controlled thereby, there becomes added a measure of certainty sufficient to give the contract mutuality." See, also, *W. G. Taylor Co. v. Bannerman,* 120 Wis. 189, 97 N. W. 918.

While the volume of the business necessarily will vary from time to time, still, if the wants of an established business are to regulate the amount of the work to be done or the

goods to be furnished, it is deemed that the measure so fixed is sufficiently definite to satisfy the rule of definiteness and certainty in the terms of a contract. Such was the case here. While the volume of business might vary considerably as compared with previous years, and while some lake carriers had the option whether they would unload their merchandise themselves or require the plaintiff to unload it, still these contingencies were simply a part of the uncertainties sur- rounding an established business which might vary its gross amount, but which are not held to make such a contract indefinite. If they should be held to make it indefinite, then every executory contract to be measured by the wants of an existing business would be fatally indefinite, because no general business can be entirely free from such uncertainties, however well established it may be. This general question was so fully discussed in the *Messinger Case* that further discussion of it now seems unnecessary.

Appellants further contend that there was a mutual settlement between the plaintiff and Promberger on August 16th, and a partial surrender of the contract, instead of an abandonment thereof by Promberger, as claimed by the plaintiff. This was a question of fact depending on the evidence, and the referee found against the appellants' contention. It is undisputed that the whole trouble which culminated on August 16th resulted from a demand on the part of Promberger's employees for an increase of pay of twenty-five per cent. This demand was made and refused on August 13th, when a number of men quit, and others quit on the 14th, and by the 16th the work on the dock had come to a complete standstill, and the yards and docks became congested with unhandled freight, notwithstanding frequent demands made by the plaintiff on Promberger that he proceed with his contract. In this situation, on the afternoon of the 16th a conference was held between some of the plaintiff's officers and Promberger, at which *Mr. Ruger,* one of the appellant sure-

ties, was present. There is a dispute as to what took place at this conference, most of the witnesses testifying that Promberger stated that he was unable to fulfil his contract and abandoned the same. *Mr. Ruger* claims, however, and other facts are relied on as supporting his version, that there was a settlement then made between Promberger and the plaintiff, and that Promberger was released from his obligations at least so far as warehouse freight was concerned. As before stated, the referee found against this contention, and as he did so upon ample evidence we are unable to disturb his finding. In this connection the appellants' claims that the contract with Promberger was modified, and that premature payments were made to the prejudice of the sureties, may also be considered. The claim of modification is based on the fact that Promberger in May, 1899, with the knowledge and consent of the plaintiff, made a contract with the Davidson Steamship Company for the unloading of a lot of steel rails upon a dock called the P. & R. dock, that the unloading of these rails was included under the terms of Promberger's contract with the plaintiff, and that thus the plaintiff and Promberger practically modified the contract. The evidence bearing on this subject was somewhat voluminous and conflicting, and a rehearsal of it would be of no practical value. The referee found that the work was outside of the contract, or at least such work as Promberger could not require the plaintiff to furnish him, and as this finding has sufficient support in the evidence we cannot disturb it.

The contract provided for semi-monthly payments to Promberger, the moneys earned from the 1st to the 15th of the month to be paid on or about the 20th day of the month, and those earned during the remainder of the month to be paid on or about the 5th of the following month. It appears that on the 15th of August Promberger had earned during the preceding half of the month $5,519.42, and that plaintiff on that day paid him that sum, and on the 16th the further sum

of $401.90 earned on the 15th, and that these payments were
made after the plaintiff knew that the contract had been vio-
lated and that it was doubtful whether Promberger could com-
plete the contract. Appellants claim that the making of these
payments on the 15th instead of the 20th (as was customary)
was, under the circumstances, such a deviation from or vio-
lation of the contract that the sureties on the bond were
thereby discharged, under the doctrine of such cases as
*Stephens v. Elver,* 101 Wis. 392, 397, 77 N. W. 737, and
*Cowdery v. Hahn,* 105 Wis. 455, 458, 81 N. W. 882. The
contention must fail. It is very evident that the provision
giving the plaintiff five days' time in which to make the pay-
ments was not a provision for the benefit of the sureties, but
simply for the convenience of the plaintiff in order to give
ample time for auditing. The money had been earned, and
the making of the payments in advance of the day when they
could have been legally demanded or sued for cannot be con-
sidered as a prejudicial variation of the contract, but merely
the waiving of a privilege which had been inserted for the
convenience of the plaintiff. *Madison v. Am. S. E. Co.* 118
Wis. 480, 95 N. W. 1097.

Several minor contentions may be briefly disposed of.
After the abandonment of the contract one Williams, an em-
ployee of the plaintiff, purchased a considerable number of
claims for wages of the men who had worked for Promberger,
to the amount of several thousand dollars, and took assign-
ments thereof, and garnished moneys on deposit to Prom-
berger's credit in a bank and earned by him from certain
steamship companies. The appellants claim that the plaintiff
participated in this attempt or colluded with Williams there-
in. This claim was negatived by the referee on sufficient evi-
dence and cannot be disturbed. The same answer must be
made to the claim that plaintiff knew that Promberger had
been guilty of embezzlement before the bond was given, as
well as to the claim that the plaintiff paid the sums of

$957.20 and $166.40 to Promberger at some time after the breach of the contract. Much complaint is made by the appellants in their briefs as to the manner of the trial before the referee, and it is claimed that the referee erred in not making sufficiently effective and sweeping orders requiring the plaintiff to produce its books and vouchers for inspection by the appellants, and in other respects did not give the appellants sufficient latitude in the matter of the examination of the books of the plaintiff and its officers. The trial was very long, and was at several times interrupted for purposes of inspection of books and papers, large quantities of which were produced for inspection. Many of these were at the offices of the plaintiff in St. Paul. Examination of the record indicates to us very clearly that the referee gave the appellants every reasonable facility in the matter of examination of books and papers as well as officers, and we deem it unnecessary to make a detailed statement of the applications and rulings.

It is claimed that because the contract provided that Promberger's bond should be conditioned to protect the plaintiff from loss by detention of freight by reason of strikes, and no such condition was inserted in the bond, nor any separate bond with that provision was given, therefore the plaintiff waived the giving of any bond or indemnity against loss by strikes, and that the loss here sued for and recovered is not covered by the bond sued on. It seems sufficient to say as to this claim that the judgment here does not include a dollar of damage for loss by detention of freight either by reason of strikes or from any other cause. The damages recovered are simply the increased expense of handling the freight above what it would have cost had Promberger carried out his contract. This being the case, the contention becomes immaterial.

It appears that Mr. J. A. Murphy was local attorney for the plaintiff at the time of the employment of Promberger as

well as at the time of the abandonment of the contract, and also has acted as such attorney during this litigation. Prior to the order of reference an attempt was made by appellants to examine him as an adverse witness under the provisions of sec. 4096, Stats. 1898, as amended by ch. 244, Laws of 1901, and, it appearing by preliminary questions and answers that his relations to the plaintiff in this matter were simply those of a local attorney, he declined to answer questions put to him, and the proceedings were dismissed by the commissioner, and a subsequent motion to strike out the complaint on account of Murphy's refusal to testify was denied by the court. After the order of reference was made, the motion to strike out was renewed before the referee and denied by him on the ground that the action was referred to him to hear, try, and determine the issues raised by the pleadings, and that he could not review the order of the court in this regard. This seems an all-sufficient reason for the ruling of the referee, but the question of the correctness of the court's ruling remains. Sec. 4097, Stats. 1898, provides that, if the witness refuse to testify, "he may be punished as for a contempt and his pleading be stricken out and judgment given against him as upon default or failure of proof." Sec. 4096, *supra*, also provides that the officer before whom the examination is held may compel the witness to answer by contempt proceedings. We are not informed why the court refused to strike out the complaint. It is suggested that the court did not consider one who acted simply as attorney to be included within the terms "agent or employee" as used in the statute. However, whatever may have been the reason, it is clearly discretionary with the court, under the statute, whether it will resort to the extreme remedy of striking out the pleadings and ordering judgment, and we are not able to say that there was an abuse of such discretion here.

The question of damages remains to be considered. The referee assessed as damages against the sureties simply the

increased cost of doing the work during the balance of the season over and above what it would have cost under the Promberger contract, deducting the amount of the payments made to Promberger on August 15th and 16th, and the amount paid for Sunday labor.  This was clearly the right rule if the plaintiff exercised due care in carrying on the work and paid out only the reasonable and necessary cost thereof, which facts were found by the referee to be true. The method used in ascertaining the amount which it would have cost under the Promberger contract was to figure up from the plaintiff's books of original entry the number of pounds of the various kinds of freight handled at the warehouses and docks during the rest of the season, and to multiply such aggregate amounts by the prices for handling fixed by the contract.  Complaint is made that the books used do not furnish accurate or reliable data for ascertaining the total amount of freight so handled, but we find upon examination of the evidence that his objection is untenable and that the results obtained were fairly and reasonably accurate.  The case was evidently tried with great care by the referee.  His findings of fact are supported by the evidence, and his conclusions of law are justified by his findings of fact and fully support the judgment entered.  Many alleged errors have not been specifically treated, but they have been considered and have not been deemed well taken nor necessary to be discussed in detail.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied March 20, 1906.